# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**KEVAN BRUMFIELD**                                                    **CIVIL ACTION**

**VERSUS**

**BURL CAIN, ET AL**                                                    **NO. 04-787-D-M2**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 10 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report.  The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 10 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in chambers in Baton Rouge, Louisiana, April 15, 2008.

_____

**MAGISTRATE JUDGE CHRISTINE NOLAND**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**KEVAN BRUMFIELD**                                        **CIVIL ACTION**

**VERSUS**

**BURL CAIN, ET AL**                                        **NO. 04-787-D-M2**

## MAGISTRATE JUDGE'S REPORT & RECOMMENDATION

This matter is before the Court on the Original and First Amended Petitions for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (R. Docs. 1 and 30) filed by petitioner, Kevan Brumfield ("Brumfield").  Through those petitions, Brumfield challenges his conviction and death sentence on the charge of first degree murder imposed in the 19th Judicial District Court, Parish of East Baton Rouge.  The State has filed oppositions to both of Brumfield's petitions.  (R. Docs. 12 and 36).

## FACTS & PROCEDURAL BACKGROUND

On February 3, 1993, Brumfield was indicted on the charge of first degree murder of Baton Rouge Police Department Corporal Betty Smothers, a violation of La. R.S. 14:30. He was formally arraigned and entered a plea of not guilty on February 12, 1993.  Following a jury trial from June 12, 1995 through July 2, 1995, Brumfield was found guilty as charged. The penalty phase of his trial was conducted on July 3, 1995, at which time Brumfield was sentenced to death.  Brumfield appealed his conviction and sentence to the Louisiana Supreme Court, both of which were affirmed on October 20, 1998.  Brumfield then applied to the United States Supreme Court for a writ of certiorari and/or review, which was likewise denied.

1

On March 16, 2000, petitioner filed an application for post-conviction relief with the state trial court.  The State filed an answer to Brumfield's post-conviction relief application, wherein it argued that all of the issues raised by Brumfield had either been raised previously on direct appeal or were procedurally barred for his inexcusable failure to raise them on direct appeal.  The State also argued that Brumfield's application should be dismissed because the remaining issues that he raised were "vague and nebulous" and did not "specify with reasonable particularity the factual basis for which relief could be granted." In response to the State's answer to his post-conviction relief application, Brumfield filed a First Amended Petition for Post-Conviction Relief.  At a hearing on October 23, 2003, Brumfield indicated that his amended petition incorporated all claims asserted in his original petition and that his amended petition was designed to replace his original petition.  *See*, Page 2, Transcript from October 23, 2003 hearing regarding post-conviction relief claims.[1]

---

[1] In his First Amended Petition for Post-Conviction Relief, Brumfield set forth the following issues for review: (1) the Eighth Amendment prohibits execution of the mentally retarded as set forth in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), an evidentiary hearing should be held regarding that issue, and petitioner should have been declared mentally retarded; (2) cumulative error renders the conviction constitutionally unreliable; (3) petitioner received ineffective assistance of counsel (a) because of the penalty phase of the trial; (b) because of the overall cumulative impact on the trial, (c) because penalty phase counsel was not properly qualified, (d) because counsel failed to investigate and prepare mitigating evidence, (e) because counsel failed to present mitigating evidence, (f) because the penalty phase argument was unacceptable and irrelevant, (g) because counsel failed to rehabilitate a social worker's testimony, (h) because counsel did not ensure production of a complete record, (i) because counsel failed to object to penalty phase evidence offered by the state, (j) because counsel failed to raise the issue of petitioner's capacity to proceed, and (k) because counsel failed to properly voir dire prospective jurors; (4) petitioner's conviction and sentence should be overturned due to juror misconduct and impartiality; and (5) other listed claims of error.

The trial court denied Brumfield's application for post-conviction relief in its entirety at the October 23, 2003 hearing.  After receiving an extension to file a writ with the Louisiana Supreme Court related to his request for post-conviction relief, Brumfield timely filed a writ on January 8, 2004, asserting the same issues as he had presented to the trial court for review.  The writ application was denied by the Louisiana Supreme Court on October 29, 2004.

Brumfield then timely filed his original petition for a writ of habeas corpus with this Court on November 4, 2004.  In his initial petition, he asserts the following issues for the Court's review:  (1) the state court erred in failing to grant relief on petitioner's *Atkins* claim and erred in refusing to hold an evidentiary hearing on his claim of mental retardation;   (2) cumulation of error rendered the conviction constitutionally unreliable; (3) he received ineffective assistance of counsel because (a) his penalty phase counsel was not qualified to try a capital case, (b) his counsel failed to investigate and prepare to offer mitigation evidence, (c) his counsel failed to adequately present mitigating evidence, (d) his counsel presented an unacceptable and irrelevant argument in the penalty phase, (e) his counsel failed to rehabilitate a social worker witness on the issue of her attitude regarding the death penalty, (f) his counsel failed to insure that a complete record of the trial proceedings was produced, (g) his counsel failed to oppose and/or object to improper evidence offered by the State during the penalty phase, (h) his counsel failed to raise the issue of his mental capacity, and (i) his counsel failed to conduct a proper examination of prospective jurors; (4) misconduct by the jurors requires his conviction and sentence to be overturned; and (5) other general claims and issues, including (a) his conviction and sentence were obtained with a confession that was not voluntary and intelligent but was instead coerced, (b) the trial

3

court's jury charge and the verdict form failed to include various lesser included offenses, (c) the prosecutor improperly presented and relied upon evidence of aggravating factors other than those listed in La. C.Cr.P. art. 905.4, (d) the trial court improperly restricted Brumfield's presentation of mitigating circumstances, (e) the record contains no indication that the jury was unanimous as to any single aggravating circumstance, (f) the trial court improperly failed to instruct the jury that each juror could consider any mitigating circumstance without the concurrence of any other juror, (g) prejudicial hearsay concerning other crimes allegedly committed by Brumfield was improperly allowed, (h) the trial court improperly allowed the prosecution to cross-examine Dr. Cecile Guin with a hearsay statement from the report of another expert who never testified at trial, (i) the trial court's jury charge as to "reasonable doubt" was constitutionally inadequate, (j) the trial court erroneously allowed the prosecutor to attack Brumfield's character on the basis of pre-trial actions and defenses pursued by his counsel, (k) death by lethal injection is cruel and unusual punishment, (l) Brumfield cannot be executed as long as he is incompetent, and (m) Brumfield has been indigent since the time of his arrest.

As noted above, the State filed an opposition to Brumfield's original habeas petition on September 7, 2005. Although the State conceded that Brumfield had exhausted his state court remedies relative to the claims in his original petition and that such petition was timely, it nevertheless argued that his claims therein should be dismissed because adequate and independent state procedural bars foreclose relief to petitioner on many of his claims and because the state court rulings denying his claims are entitled to a presumption of correctness.

4

On January 17, 2006, Brumfield's original habeas petition was referred to the undersigned for a report and recommendation.  However, prior to such report being issued, the Court appointed counsel for Brumfield, and a status conference was held on April 24, 2006, at which time Brumfield's newly-appointed counsel indicated that he would need some time to conduct fact and expert discovery and to prepare a first amended habeas petition ("amended petition").  A proposed budget was initially submitted by petitioner's counsel relative to the funds that would be needed for fact and expert investigation and the preparation of the amended petition; however, due to the association of the Federal Public Defender Board in this case on December 5, 2006, it was no longer necessary for the Court to set a budget, as that office undertook the financial obligations of the case.  Following fact and expert discovery, Brumfield's amended petition was filed on October 1, 2007, which presented additional argument and evidence relating to the following claims that had been asserted in Brumfield's original habeas petition:  (1) that Brumfield suffers from mental retardation and therefore cannot be executed; (2) that execution by lethal injection violates Brumfield's right to be free from cruel and unusual punishment under the Eighth Amendment; and (3) that Brumfield's conviction and sentence were obtained with a confession that was not voluntary and intelligent but instead was coerced in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

The State opposes Brumfield's amended petition and contends that it should not be considered by the Court because:  (1) the claims raised therein have not been properly exhausted in the state courts because Brumfield seeks to greatly expand both the claims he presented to the state courts as well as the facts and evidence in support of his claims; and (2) the claims asserted therein do not "relate back" to Brumfield's original petition filed nearly three years ago.

## LAW & ANALYSIS

**I.     Do adequate and independent state procedural bars foreclose relief to Brumfield on Claim Nos. 2, 4, and 5 of his original habeas petition?**

A federal court that reviews a state prisoner's habeas claim must respect a state court's determination that the claim is procedurally barred under state law. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 2508-09, 53 L.Ed.2d 594 (1977).  However, a procedural default does not bar consideration of a federal claim on habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997)(A state procedural rule enjoys a presumption of adequacy when the state court expressly relies on it in deciding not to review a claim for collateral relief).  However, if a petitioner can show "cause" and "prejudice" for his procedural default, the court may review the merits of his claims.  *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991)("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause and prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice").

The last state court to address the merits of Brumfield's claims was the 19th Judicial District Court, when it considered Brumfield's amended petition for post-conviction relief

during a hearing on October 23, 2003.[2] [3]  In its opposition to Brumfield's original habeas petition, the State contends that Claim Nos. 2, 4, and 5 of that petition were dismissed by the trial court pursuant to independent and adequate state procedural grounds.  The Court agrees.

The trial court dismissed Claim No. 2, the general claim that a cumulation of error rendered the conviction constitutionally unreliable, on the following grounds:

> [Brumfield] does not provide any evidence of error in that claim. There is no showing of how the accumulation of error in this case renders the conviction unconstitutionally reliable.  It does not specify with reasonable particularity the factual basis and does not allege a claim which if established would entitle the petitioner to relief, so that claim is dismissed.

*See,* Post-Conviction Relief Hearing transcript, Page 4.  Based upon the express language used by the trial judge, it is clear that Claim No. 2 of the original petition was dismissed pursuant to the following three articles: (1) La. C.Cr. P. art. 926(B)(3), which provides that, in a petition for post-conviction relief, a petitioner shall state the grounds upon which relief is sought, specifying "with reasonable particularity the factual basis" for such relief; (2) La. C.Cr.P. art. 926(E), which states that the "inexcusable failure of the petitioner to comply with the provisions of [art. 926] may be a basis for dismissal of his application;" and/or (3) La. C.Cr.P. art. 928, providing that a post-conviction relief application may be dismissed "if the application fails to allege a claim which, if established, would entitle the petitioner to relief."

---

[2] During the hearing, the trial court confirmed with Brumfield's counsel that the amended petition for post-conviction relief incorporated all claims in the original petition, was intended to replace the original, and was to be the only petition considered during the October 23, 2003 hearing.

[3] As noted above, although Brumfield filed an application for a writ to the Louisiana Supreme Court to have it review the trial court's decision on his post-conviction relief application, the Supreme Court denied Brumfield's writ application on October 29, 2004.

The "independence" requirement is fulfilled relative to Claim No. 2 because the last state court rendering a judgment on the merits of Brumfield's claim "clearly and expressly" indicated that the judgment rested on a state procedural bar.  *Glover*, at 902, citing *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995).  Moreover, La.C.Cr.P. articles 926 and 928 enjoy a presumption of "adequacy" because the state court expressly relied upon them in deciding not to review a claim for collateral relief.  *Glover*, at 902.  There is no suggestion that such rules have been applied selectively or irregularly by the state courts, and Brumfield has not come forward with any argument or evidence to trump the presumption of adequacy.  *Id.* (An "adequate" rule is one that state courts strictly or regularly follow, and one that is applied evenhandedly to the vast majority of similar claims).  Accordingly, Brumfield is procedurally barred from asserting Claim No. 2 in this Court, and that claim should be dismissed.  *Sayre v. Anderson*, 238 F.3d 631 (5th Cir. 2001).

As to Claim No. 4 of his original petition, alleging jury misconduct and lack of impartiality, the trial court dismissed that claim on the following grounds:

> The defendant claims that anti-defense gestures were made by a juror and reports of familiar relationship being demonstrated following the jury's return of the death sentence.  This is not grounds for post-conviction relief, even if it was set out with enough particularity, and, therefore – well actually – and it's also something that should have been raised on appeal . . .
>
> * * * * *
>
>  . . . [T]he bottom line is that does not fall within the grounds for post-conviction relief, in any event, and, therefore, that will be dismissed based on that.  The second part of his claim is that the jury lacked impartiality due to pretrial publicity.  The issue of venue change was unsuccessfully raised on appeal, and in addition to that, again, it is also not grounds for post-conviction relief as set out in 930.3.  Therefore, that one will be dismissed.

*See,* Post-Conviction Relief Hearing transcript, Pages 10-11.  Considering that Claim No. 4 was expressly dismissed on procedural grounds pursuant to La.C.Cr. P. art. 930.3

(setting forth the specific grounds for which a petitioner shall be granted post-conviction relief) and La. C.Cr.P. art. 930.4 (providing that any claim for relief which was fully litigated on appeal shall not be considered on a post-conviction relief application), both of which have been recognized as "independent" and "adequate" grounds precluding federal review,[4] the Court should also dismiss Claim No. 4 as procedurally barred.

Finally, with regard to Claim No. 5 of the original petition, which includes thirteen general allegations of error, the trial court stated the following:

> The Court:  Claim Number 5 is a group of claims, Paragraphs 91 through 100, which each set out claims that are I guess separate from each other, and I'll take those one at a time; although, I will say that my reading them, none of these are actually claims that fall within the enumerated grounds for post-conviction relief, and some have already been raised on appeal.  Paragraph 91 refers to the coerced confession.  That issue was raised on appeal.  Therefore it will be dismissed. Paragraph 92, jury charge and verdict form failed to include various lesser included offenses, for example, attempted first degree murder, et cetera.  I'm not sure why that wasn't raised on appeal, which would be the time to challenge the juror – I'm sorry, the jury charge, but the law is clear that that is not a responsive verdict set out in the Code of Criminal Procedure. And, again, just so the record is clear, why wasn't that raised on appeal?
>
> Mr. Westling [defense counsel]:  I can't answer that, Judge. Not having handled the appeal makes that difficult to understand.
>
> The Court: That one will also be dismissed.  Paragraph 93, prosecutor improperly presented and relied on improper aggravating factors.  Again, this is not grounds for post-conviction relief.  It's something that should be handled on appeal.
>
> Mr. Westling: I'm sorry?

---

[4] *See, Hull v. Stalder*, 234 F.3d 706 (5th Cir. 2000)(La.C.Cr.P. art. 930.3 was held to serve as an independent and adequate state law ground for denial of federal habeas review); *Desalvo v. Cain*, 2002 WL 1585564)(La. C.Cr.P. art. 930.4 held to have acted as an independent and adequate state ground to preclude a claim).

The Court: Do you have any reason why it was not?

Mr. Westling: No, I don't.

The Court: All right.  That is dismissed.  Paragraph 94, the trial court improperly restricted the defendant's presentation of mitigating circumstances.   That was raised on appeal unsuccessfully.  Therefore, that is dismissed.  Paragraph 95 alleges that there was no indication that the jury's verdict was unanimous.  Again, this is not something that's set out in the grounds for post-conviction relief.  It's also something that should have been handled on appeal, and I assume –

Mr. Westling: The same answer.

The Court:  – You don't know why.

Mr. Westling:  Exactly, your Honor.

The Court: In any event, that is dismissed.  It's not grounds and should have been handled on appeal.  The trial court failed to properly instruct the jury.  The same response.  It's not ground under 930.3 and should have been handled on appeal.  And I assume, again, you didn't handle it.  You can't answer why it was not.

Mr. Westling: That's correct, your Honor.

The Court: That one is dismissed.  Paragraph 97, prejudicial hearsay concerning other crimes was improperly allowed.  That was argued on appeal and litigated on appeal, and therefore, that will be dismissed.  Paragraph 98, hearsay issue relating to the State's cross-examination of social worker.  That was appealed and litigated on appeal, and, therefore, that will be dismissed.  Paragraph 99, reasonable doubt instructions were constitutionally inadequate.   This was raised on appeal. Therefore, it will be dismissed.  Paragraph 100, the trial court allowed the state to attack the defendant's character on an improper basis.  And, again, that was appealed, and like all of these, Paragraph 91 through 100, it's not proper grounds for post-conviction relief.

In the defendant's reply to the State's response to the Amended Petition for Post-Conviction Relief, the defendant also asserted that the above claims have not been fully investigated and therefore may not properly be presented for post-conviction relief due to lack of funds.  I'm not exactly sure whether that's another claim for post-conviction relief.  If it is,

> it's not one that fits within the grounds under 930.3, and it's not set out with enough particularity. Therefore, it will be dismissed. And since the amended petition replaced the original petition I think that's all of the claims that are being addressed at this time.

*See,* Post-Conviction Relief Hearing transcript, Pages 11-14. Considering that the trial court clearly and expressly dismissed the various allegations contained in Brumfield's Claim No. 5 based upon La.C.Cr.P. arts. 930.3 and 930.4, Brumfield is procedurally barred from raising those claims upon habeas review. Furthermore, Brumfield has not demonstrated cause or prejudice relative to his procedural default on Claim Nos. 2, 4, and 5, and the Court therefore cannot review the merits of those claims.

**II.    Should Brumfield's remaining claims be dismissed because the state trial court's rulings on those claims are entitled to a "presumption of correctness"?**

An application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication of the claim: (1) resulted in a decision that is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1) and (d)(2). In addition, determinations of factual issues made by state courts shall be presumed correct, unless particular statutory exceptions to 28 U.S.C. § 2254(d) are implicated, and the applicant shall have the burden of rebutting that "presumption of correctness" by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Williams v. Collins*, 16 F.3d 626 (5th Cir. 1994).

**(A)     Claim No. 1 of Brumfield's original and amended habeas petitions:  The state court's failure to hold an *Adkins* hearing on the issue of mental retardation and related failure to find Brumfield mentally retarded:**

**(1)     Applicable Law:**

In *Adkins v. Virginia*, *supra*, the United States Supreme Court held that execution of mentally retarded persons constitutes an excessive punishment in violation of the Eighth Amendment.  *Id.* at 321.[5]  The Supreme Court left to the states the "task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences."

---

[5] In defining "mental retardation," the U.S. Supreme Court in *Adkins* referred to the definition used
by the American Association on Mental Retardation ("AAMR"), which defines the term as follows:

> Mental retardation refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18.  Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

The Supreme Court also referred to the similar definition of "mental retardation" used by the American Psychiatric Association:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.  Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000).  "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.  *Id.*, at 42-43.

*Atkins*, at 309.

*Id.* Subsequently, in *State v. Williams*, 01-1650 (La. 11/1/02), 831 So.2d 835, the Louisiana Supreme Court adopted the holding in *Atkins*, and assuming the task of developing appropriate ways to determine which offenders will be spared the death penalty because of mental retardation, the Louisiana Supreme Court directed trial courts, in post-*Atkins* hearings:

> (1)   to order a pre-trial evidentiary hearing on the issue of mental retardation when the court has 'reasonable grounds' to believe a defendant is mentally retarded, [La.C.Cr.P.] art. 643;
>
> (2)   to hold the hearing before a judge, not a jury; and
>
> (3)   to require the defendant to prove by a preponderance of the evidence that he meets the criteria established in Louisiana's statutory definition of mental retardation, La. R.S. 28:381 [defining retardation as "significantly subaverage general intellectual functioning, existing concurrently with deficits in adaptive behavior, and manifested during the developmental period].

*See, Williams*, at 854; *State v. Lee*, 2005-2098 (La. 1/16/08), 2008 WL 343031.  As to intelligence testing, the Louisiana Supreme Court noted that the Wechsler and the Stanford-Binet IQ scales are most frequently used, and sub-average intelligence on those tests is 70 or below using the Wechsler scale, and 68 or below using the Stanford-Binet Scale. *Id.* at 853.  With regard to adaptive skills, the court noted that the individual must have substantial functional limitations in several areas of major life activity:  (1) self-care, (2) understanding and use of language, (3) learning, (4) mobility, (5) self-direction, and (6) capacity for independent living.  *Id.* at 854.  The court pointed out that it is the individual defendant's burden to provide objective factors that put at issue the fact of mental retardation, and a defendant's entitlement to an *Atkins* hearing is to be made on a case-by-case basis.  *Id.* at 857.

In response to *Atkins* and *Williams*, the Louisiana Legislature enacted 2003 LA. ACTS 698, which created La.C.Cr.P. art. 905.5.1.  Article 905.5.1 provides for a procedure used in the event a defendant raises a claim of mental retardation.  Under that article, such a defendant has the burden of proving mental retardation by a preponderance of the evidence, and mental retardation is defined as:

> a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  The onset must occur before the age of eighteen years.

La. C.Cr.P. art. 905.5.1(H)(1); *State v. Lee*, at *27.  The article concludes with an advisory list of several medical conditions which "do[ ] not necessarily constitute mental retardation." *Id.*  Included in that list are behavioral disorders; difficulty in adjusting to school; emotional disturbance; emotional stress in home or school; emotional, cultural, or economic disadvantage; epilepsy or other seizure disorders; lack of educational opportunities; mental illness; neurological disorders; organic brain damage occurring after age 18; learning disabilities; speech and language disorders; and personality disorders.

### (2)    Brumfield's state post-conviction *Atkins* claim:

During Brumfield's October 2003 hearing on his post-conviction relief application, the trial judge addressed his mental retardation claim and the trial court's failure to hold an evidentiary hearing relative to such claim.  *See*, Post-Conviction Relief Hearing transcript, Page 3.  He noted that not everyone facing the death penalty is entitled to such an evidentiary hearing and further stated:

> The cases say that that's to be taken up on a case-by-case method, and the burden of proving that that is an issue that needs to be addressed is on the defendant here.  I've looked at the application, the response, the record, portions of the transcript on that issue, and the evidence presented, including Dr. Bolter's testimony, Dr. Guin's testimony, which refers to and discusses Dr. Jordan's report, and based on those, since

> this issue – there was a lot of testimony by all of those in Dr. Jordan's report.  Dr. Bolter in particular found [Brumfield] had an IQ of over – or 75.  Dr. Jordan actually came up with a little bit higher IQ.  I do not think that the defendant has demonstrated impairment based on the record in adaptive skills.  The doctor testified that he did have an anti-social personality or sociopath, and explained it as someone with no conscience, and the defendant hadn't carried his burden placing the claim of mental retardation at issue.  Therefore, I find he is not entitled to that hearing based on all of those things that I just set out.

*See,* Post-Conviction Relief Hearing transcript, Pages 3-4.  In reaching his conclusion on Brumfield's post-conviction *Atkins* claim, the trial judge relied upon evidence that had been produced during Brumfield's state sentencing proceedings.[6]  It should be noted, however, that, because Brumfield's sentencing proceedings occurred in 1995, prior to *Atkins* being decided in 2002, the focus of his experts' evaluations and testimony during those proceedings did not concern the elements of proving mental retardation as defined by the Louisiana Supreme Court and Louisiana legislature following *Atkins.*  Instead, the testimony and evidence presented at Brumfield's sentencing hearing related to Brumfield's medical history, mental illness/attention deficit disorder, and abuse/neglect.

Specifically, during Brumfield's sentencing hearing, he presented the testimony of Dr. John Bolter ("Dr. Bolter"), a clinical neuropsychologist.  Dr. Bolter testified regarding a comprehensive battery of tests that he performed on Brumfield to determine whether he had any neurological deficits in cognitive functioning.  Sentencing Hearing, Vol. XVI, p. 145.  His findings included the following:  (1) Early in life, Brumfield manifested conduct disorder with extreme levels of aggressivity and a disregard for basic rights of others, educational

---

[6] With his original and amended post-conviction relief applications, Brumfield did not submit any new evidence in support of his mental retardation claim and instead submitted five paragraphs, which cited to evidence that had been presented during his sentencing proceedings.

problems, and attention deficient disorder; and (2) As an adult, Brumfield has had more of

an antisocial or sociopathic personality, continued attention difficulty (*i.e.*, he cannot

concentrate for an extended period), borderline general level of intelligence, specifically an

IQ of 75 using the Webster Adult IQ test (very poor academic skills, including a fourth grade

reading level and sixth grade math and spelling level), and a rapid rate of forgetting due to

his attention deficit disorder.  Vol. XVI, pgs. 146-147.  Dr. Bolter testified that he was aware

that Dr. Bryan Jordan ("Dr. Jordan") also tested Brumfield's IQ and rated it a "little higher"

than he had and that his testing did not factor in Brumfield's ability to function in the real

world.[7]  Vol. XVI, p. 149, 151.  Dr. Bolter further indicated that, while Brumfield's low birth

weight placed him at risk for some form of potential neurological trauma, it was not

necessarily predictive of significant mental difficulties, and some children with Brumfield's

birth weight are "just fine."  Vol. XVI, pg. 148.  Lastly, Dr. Bolter explained that physicians

attempted to treat Brumfield with medications for his condition, but he refused to take the

medications.

The defense also presented the testimony of Dr. Cecile Guin ("Dr. Guin"), a social

worker who evaluated Brumfield, during the sentencing phase.  Sentencing Hearing, Vol.

XVI, p. 99.  Dr. Guin conducted a social history on Brumfield by interviewing him ten to

twelve times and by interviewing his third, fourth, and fifth grade teachers, various family

members of the defendant, and Dr. Bolter.  Vol. XVI, p. 112-113.  She also reviewed

various records from physicians, medical facilities, and homes visited by Brumfield.  She

testified that Brumfield's childhood family life was "very chaotic, [and] very complicated,"

---

[7]  Dr. Jordan's report also indicated that Brumfield's intellectual functioning was "slightly limited but generally close to the Average Range."  (Dr. Jordan's report, p. 3).  Dr. Jordan also concluded that Brumfield had a sociopathic personality disorder, antisocial in type, and poor impulse control, especially in the area of aggression.  Vol. XVI, p. 139-140.

and that Brumfield's family was not able to teach him how to fit into society (*i.e.*, no role model). Vol. XVI, p. 114. Combined with this non-supportive home environment, Dr. Guin concluded that the following factors had shaped Brumfield as a person: (1) his low birth weight, (2) a neurologically-based hyperactivity or learning disability which was not diagnosed early enough, (3) six out-of-home placements, (4) his failure to get help immediately in the school system, (6) six father figures, and (7) going to fourteen to fifteen different schools in 14 years (and being discharged from the East Baton Rouge Parish School System at the end of the ninth grade). Vol XVI, pgs. 128-129.

On cross examination, however, the State brought out several inconsistencies in information provided to Dr. Guin by Brumfield and others. For example, Brumfield's mother reported that her son weighed 2.5 pounds at birth and that he was born prematurely, neither of which were consistent with official medical records. Vol. XVI, p. 114. In addition, Brumfield told Dr. Guin that he had only witnessed a murder related to a drug deal in 1989, while he informed Dr. Jordan that, during that incident, he shot a drug user who refused to pay and fled in his car. Vol. XVI, p. 135.[8]

Brumfield also told Dr. Guin that he had been employed as a cook at two restaurants during his adult life, and the maximum period of Brumfield's adult work history involved working approximately three months at Ralph and Kacoo's Restaurant. Vol. XVI, p. 138. Dr. Guin also testified that Brumfield told her he quit his job at Ralph and Kacoo's to sell drugs because it was a "more effective" way of making a living. Vol. XVI, p. 138. When presented with information from Dr. Jordan's report indicating that Brumfield was "quite

---

[8] Brumfield also reported to Dr. Guin that he was facing charges for an armed robbery that occurred during a drug deal; however, Dr. Guin admitted on cross examination that she was unaware that the defendant had actually been convicted of armed robbery and that he had put a gun to the victim's head and pulled the trigger. Dr. Guin also stated that she had not interviewed the two victims of the armed robbery. Vol. XVI, pgs. 136-137.

active socially" and that he had five illegitimate children with three different females that he did not support, Dr. Guin noted that, based upon information she obtained from the mother of Brumfield's first two children, Brumfield supported his first child.  Vol. XVI, p. 139.

It was also pointed out on cross examination that Dr. Guin's testimony on direct examination regarding Brumfield's record of disciplinary incidents while in parish prison was based upon inaccurate records.  She testified that Brumfield was involved in a total of thirteen incidents during the two and a half years he had been in prison and that those incidents had decreased over time.  Vol. XVI, pgs. 131-132.  However, she admitted, on cross examination, that she was unaware that Brumfield had been convicted of battery of a police officer while in prison and that such conviction might have affected some of her conclusions depending on the timing of the conviction.  Vol. XVI, p. 137, 142.

The defense also presented the testimony of several of Brumfield's family members, who basically testified regarding abuse and neglect of Brumfield during his childhood.[9] However, the attorney for the Louisiana Office of Human Services indicated to the trial court during the sentencing phase that that office had no records on Brumfield concerning child abuse or neglect.  Vol. XVI, p. 79.  Finally, the defense called Brumfield's fourth grade teacher, Karen Cross, to testify as to the defendant's behavior and problems while at school.  She testified that Brumfield could be very loving and affectionate at times and then

---

[9] Vella Brumfield, the defendant's mother, testified that Brumfield "missed [a] father figure" during his childhood and that he had a terrible relationship with his stepfather.  She indicated that her son was a "Straight A" student during first and second grade but started having problems after his parents became separated.  She further testified that her son declined in terms of education and "crime-wise" when he was  placed in homes after the fifth grade.  Vol. XVI, p. 63-75.  Brumfield's father, Thurmond Ellis, indicated that he saw his son on a weekly or monthly basis after he and the defendant's mother split and that he recalled reports that Brumfield and his brother were abused by their stepfather.  Vol. XVI, p. 84-86.  Brumfield's brother, Teodis Brumfield, testified to verbal and physical abuse that he and his brother allegedly sustained and to a single alleged seizure that his brother had as a child.  Teodis Brumfield admitted that he had been convicted as an accessory after the fact to an armed robbery in Clinton, Louisiana, at which the defendant was present.  Vol. XVI, p. 93-98.

"completely disruptive" at other times.  She felt that his problems were due to issues with his attention span, making him better in a one on one situation or in small groups; however, she admitted, on cross examination, that she had not seen or had any awareness of the defendant's life activities in the ten to twelve years prior to her testimony.  Vol. XVI, p. 88-92.

Based solely upon the evidence presented at Brumfield's sentencing hearing (and referenced in his amended post-conviction relief application), the Court agrees with the trial judge's conclusion that Brumfield failed to meet his burden of presenting objective factors that put at issue the fact of mental retardation and that he therefore was not entitled to an *Atkins* hearing.  As noted above, the first objective factor that the defendant must sufficiently put at issue is sub-average intelligence, as measured by standardized IQ tests. As noted above, according to the IQ levels accepted by the U.S. and Louisiana Supreme Courts, sub-average intelligence is 70 or below using the Wechsler scale, and 68 or below using the Stanford-Binet Scale.  The IQ score testified to by Dr. Bolter was 75, which is not low enough to be placed in either of those categories of sub-average intelligence.

Furthermore, as to the second objective factor, significant impairment in several areas of adaptive skills, the testimony presented did not indicate that Brumfield was unable to live and function on his own in society or that he lacked the ability to care for himself, understand and use language, be mobile, or direct his life activities.  Dr. Bolter, Dr. Guin, and Brumfield's teacher, Karen Cross, in fact, indicated that a significant part of Brumfield's difficulties actually stem from his attention deficit disorder, for which he does not take medications, and which, while it results in an inability to focus, is not equivalent to mental

retardation.[10]

Finally, as to the third objective factor (manifestations of a neuropsychological disorder prior to the age of eighteen), none of the defense experts at the sentencing hearing testified that Brumfield was mentally handicapped but rather agreed with Dr. Jordan's assessment that he had an antisocial or sociopathic personality disorder with associated attention and learning difficulties.[11]   Brumfield's related attention and learning difficulties were noted to cause him to have a decreased ability to focus and process information; however, Brumfield's experts did not indicate that such difficulties resulted in an inability to function in society and perform the daily tasks of living.   Thus, when only the evidence presented for the trial court's review at the October 2003 post-conviction relief hearing is considered, the Court finds that the trial judge's conclusion with respect to the need for an *Adkins* hearing on the issue of mental retardation was reasonable and in accordance with clearly established federal law.

---

[10] Dr. Guin also strongly linked Brumfield's difficulties educationally and in life generally with his disruptive homelife during his childhood, unsubstantiated reports of abuse and neglect, and out of home placements, all of which indicate issues related to socialization rather than mental retardation.  While there was some general testimony that Brumfield's low birth weight could have had possible cognitive impacts, Dr. Bolter admitted that low birth weight is not necessarily predictive of significant mental defects.  Furthermore, neither Dr. Bolter nor Dr. Guin provided any testimony regarding the alleged seizure sustained by Brumfield as a child.  Dr. Guin also testified that Brumfield made a conscious decision to quit gainful employment at a restaurant and make his living through drug dealing because he found it to be a "more effective" way to make a living.  That decision, along with testimony that Brumfield was "quite active socially" and supported at least one of his children, indicates that Brumfield had the ability to independently direct his life activities.

[11] As noted above, learning disabilities and behavioral and personality disorders are included among the list of conditions in La.C.Cr.P. art. 905.5.1, which do not necessarily constitute mental retardation.

**(3)    Newly-presented evidence in Brumfield's amended habeas petition concerning his *Atkins* claim:**

The next issue for the Court's determination is whether or not it should consider certain additional evidence that Brumfield has now presented with his amended habeas petition relative to his *Atkins* claim that he did not present to the state court during his post-conviction relief proceedings or to this Court with his original habeas petition.  The reason the Court must make this determination is to ensure that Brumfield properly exhausted his *Atkins* claim in state court before raising it in this Court.  The exhaustion requirement is satisfied if a petitioner has "fairly presented the substance of his claim to the state courts" and is not satisfied if he "presents new legal theories or factual claims in his federal habeas petition."  *Moore v. Quarterman*, 491 F.3d 213 (5th Cir. 2007), citing *Vasquez v. Hillery*, 474 U.S. 254, 258, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986).  The Fifth Circuit Court of Appeals has addressed the precise issue before the undersigned in several cases and has held that, if the new evidence which is presented for the first time in the federal habeas court *"merely supplements"* the evidence presented in state court and does not *"fundamentally alter"* the petitioner's claims, the claim is to be considered exhausted, and the new evidence can be considered.  *Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005)[Emphasis added].

To understand what the Fifth Circuit means by the above standard, the Court will examine two cases in which that standard was applied relative to an *Atkins* claim and then, in light of those cases, apply the standard to the present case.  In 2005, the Fifth Circuit applied the above-referenced standard in *Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005).  In that case, the petitioner, Morris, did not include an IQ score in a successive state habeas petition (which he filed as a result of *Atkins* being decided) because he lacked the funds to obtain the expert assistance required to administer such a test.  After his state petition

21

was dismissed, the Fifth Circuit allowed Morris to file a successive federal habeas petition on the *Atkins* issue, and the district court granted him leave to retain an expert and investigative assistance. Morris underwent IQ testing, which revealed that he had a full-scale IQ of 53, and he presented that evidence to the federal court.

The State, in *Morris*, contended that the petitioner's *Atkins* claim was unexhausted because he had failed to present his IQ evidence to the state court. The Fifth Circuit disagreed, finding that, although Morris's federal claim was "unquestionably in a comparatively stronger evidentiary posture than it was in state court," several factors weighed in Morris's favor, specifically the following:

> [Morris] . . . properly outlined the AAMR's definition for mental retardation [in his state habeas petition], . . . and noted the necessity to meet all three essential prongs of the definition. Morris also clearly acknowledged that IQ evidence was lacking in his particular case but still insisted "[t]here is good reason to believe that [Morris is retarded] . . . because of the documented history of adaptive deficits," including Morris's "inability to read and write and his failure in functional academics," "inability to obey the law and follow rules," "inability to avoid victimization," "inability to develop instrumentalities of daily living [and] occupational skills," and "inability to maintain a safe environment," all of which were attested to by the sworn affidavits and school records presented to the state courts."

*Id.* [Citations omitted].

The Fifth Circuit noted that Morris had "consistently asserted that[,] given the opportunity and resources, intellectual tests would confirm" his mental retardation. *Id.* The Fifth Circuit therefore held that the state court had been given a fair opportunity to rule on the substance of the petitioner's *Atkins* claim and that his presentation of the IQ score for the first time on federal review only "supplemented, but did not fundamentally alter," that

claim.  *Id.*[12]

By contrast, in the more recent case of *Moore v. Quarterman*, 491 F.3d 213 (5th Cir. 2007), the Fifth Circuit found that a successive state court habeas petition filed by the petitioner, Moore, on an *Atkins* claim "paled in comparison" to the one considered in *Morris*. Moore merely asserted in his state court petition that he had scored a 74 on an IQ test when he was a child, that he had been placed in special education classes throughout his schooling, and that he had suffered multiple head injuries, one of which occurred when he was no older than ten.  *Id.*, at 221.  Unlike Morris, who submitted sworn affidavits and school records to support his claim, Moore simply cited to the trial record in support of his claims.  He also failed to reference the AAMR's diagnostic criteria for mental retardation or the similar definition adopted in the Texas Health and Safety Code.  The Fifth Circuit found most significant Moore's failure to allege that he was deficient in two or more adaptive skill areas.  The court of appeal noted that, even if the fact that Moore was in special education classes throughout his schooling could arguably be construed as an allegation that he was only minimally functional in an academic setting, he did not provide any evidence in support of that assertion, such as an identification of any specific special education classes he attended or documentation regarding those classes.  Because Moore's petition "did not touch, even arguably, on any other adaptive skill area, let alone explain why supporting evidence was lacking," the Fifth Circuit held that the state habeas petition could not be considered sufficiently "detailed in fact and law" to warrant a finding

---

[12] The Fifth Circuit considered *Morris* to be an "admittedly close case" on the issue of exhaustion but found that three factors weighed in favor of a finding of exhaustion:  (1) A thorough review of Morris's state habeas petition revealed that his *Atkins* claim was "remarkably detailed in both fact and law;"(2) Morris consistently asserted that he was mentally retarded and that, given the opportunity and resources, intellectual tests would confirm that assertion; and (3) There was nothing in the record to suggest that Morris "attempted to expedite federal review by deliberately withholding essential facts from the state courts."  *Id.*, at 496.

of exhaustion." *Id.*, at 222.

In conclusion, the Fifth Circuit in *Moore* held that a petitioner has not adequately presented the substance of his *Atkins* claim to the state court for purposes of exhaustion unless he has, at the very least:  (1) outlined the AAMR criteria or the substantial equivalent adopted by the applicable state; and (2) either alleged why he satisfies each criterion or asserted reasons why he is currently incapable of presenting any evidence on a particular prong.  *Id.*, at 223.  The court found Moore's state court petition "more akin to the type of conclusional allegation that [it] found insufficient to support exhaustion on an ineffective assistance of counsel claim in *Kunkle v. Dretke*, 352 F.3d 980 (5th Cir. 2003), than . . . to the robust claim of mental retardation presented to the state by the petitioner in *Morris.*" *Id.*[13]  Finally, the court concluded that Moore's procedural default, in failing to cite the *Atkins* prongs and submit evidence supporting each prong in his case, could not be excused because Moore had failed to demonstrate cause for his failures and actual prejudice.  *Id.*,

---

[13] *See, Kunkle v. Dretke*, 352 F.3d 980 (5th Cir. 2003)(In state court, the petitioner only presented a conclusory affidavit from trial counsel "contending that there was abundant mitigating evidence . . . including, a troubled home life and family history of mental illness" to support his ineffective assistance of counsel claim.  However, in federal court, he presented actual evidentiary support, including an affidavit from his mother and a detailed psychological report.  The Fifth Circuit held that the petitioner's claim was unexhausted).

*See also, Dowhitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000)(holding that the petitioner had exhausted his ineffective assistance of counsel mental illness claim where he presented detailed assertions of his paranoid schizophrenia to the state courts, even though he later offered additional affidavits by mental health experts opining on that same diagnosis to the federal court that were not previously presented to the state courts); *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003)(In state court habeas proceedings, the petitioner argued that his counsel was ineffective for failing to investigate and present the testimony of an eyewitness whose testimony would have excluded the petitioner as the perpetrator.  The petitioner did not include any evidence to support that allegation in state court; however, in federal court, he attached the eyewitness's affidavit stating that the petitioner was not present at the scene of the crime.  The court held the exhaustion principle was satisfied, noting in an "admittedly close case" that several factors weigh in favor of exhaustion:  (1) the ineffectiveness portion of the state habeas brief was "remarkably detailed in both fact and law;" (2) the petitioner was diligent and consistent in arguing his claim; and (3) the petitioner did not attempt to expedite federal review by withholding essential facts from the state courts).

citing *Hillery*, 474 U.S. at 260, 106 S.Ct. 617.

As mentioned above, in his amended post-conviction relief application, Brumfield did not submit any new evidence in support of his mental retardation claim and instead submitted five paragraphs, which set forth the following information and cite to testimony that had been presented during his sentencing proceedings:

- Brumfield was 20 years of age at the time of the murder and still within the developmental stage set by the Louisiana statutes.

- Brumfield's IQ score as determined shortly before trial was 75, on the low end of the intelligence scale, and he was reading at approximately a fourth grade level.

- Brumfield was born prematurely; his birth weight was 3.5 pounds or less; medical records indicated that "he was born with slower responses than normal babies;" and he remained hospitalized for two to three months after birth.

- From childhood, Brumfield suffered severe, uncontrolled seizures; he was treated with numerous medications, including: Thorazine, Mellaril, Ritalin, Artane, and Vistaril; and he was treated as a child and adolescent at two psychiatric hospitals.

- As early as third grade, Brumfield's learning and behavioral disabilities were noted by teachers, and once diagnosed, he spent a significant amount of his schooling in special education classes.

*See*, First Amended Petition for Post-Conviction Relief. Brumfield concluded, in his amended petition for post-conviction relief, that, based upon his "IQ score of approximately 75, [his] deficits in adaptive behaviors, and his condition exist[ing] before the age of eighteen," his personal culpability in the murder was diminished, and his execution would not serve the two penological goals of the death penalty. He therefore claimed that he could not be executed and that he was entitled to an evidentiary hearing on his mental retardation claim in accordance with *Atkins* and *Williams*. It should also be noted that, in

25

his original post-conviction relief application, and on at least two other occasions, Brumfield's counsel requested funds so that he could conduct an investigation and retain experts relative to Brumfield's claims; however, the state trial court never ruled upon those requests prior to denying Brumfield's post-conviction relief application.

Now, with his amended habeas petition, Brumfield seeks to introduce evidence fulfilling the three prongs of the AAMR definition of mental retardation that he was not able to produce in state court.  For example, relative to his IQ, Brumfield has undergone, during the course of these proceedings, another Stanford-Binet IQ test, administered by a neuropsychologist, Dr. Ricardo Weinstein ("Dr. Weinstein"), which indicates that he has a Full Scale IQ of 69.9, within the range identified for sub-average intelligence.  Based upon that IQ score as well as various interviews with witnesses and a review of background materials, which reveal that Brumfield has exhibited concurrent adaptive behavior deficits in practical, social, and conceptual skills since before he was age 18, Dr. Weinstein concludes that Brumfield is mentally retarded.[14]

---

[14] As part of his evaluation, Dr. Weinstein interviewed eleven people who have known Brumfield throughout his life, such as family members, a coach, a teacher, and the mother of one of his children.  Dr. Weinstein also administered the Adaptive Behavior Assessment System II, (ABAS II), an instrument used to assess an individual's adaptive skills, to Brumfield and to his sister.  The ABAS II results show a qualitative range of "extremely low" in all categories. Through the interviews Weinstein conducted, he assessed Brumfield's conceptual, practical and social skills, and he specifically concluded that the following are examples of activities and behaviors that Brumfield's siblings achieved that Brumfield did not achieve, in spite of being exposed to very similar environments and circumstances:

- Compared to siblings and cohorts, Brumfield was always delayed.
- He was unable to understand simple instruction even during his teen and adult years.
- As a child and juvenile, he was often unable to understand and follow rules of games and participate with his peers.
- He was unable to achieve academically even though he received special services and support.
- He had problems with his emotions and impulses.
- He exhibited poor judgment, and even as an adult, he was not aware of the consequences of his actions.

Brumfield also presents with his amended habeas petition the opinions of Dr. Victoria Swanson ("Dr. Swanson"), who reviewed his school records, mental health records, and various other materials during the course of these proceedings and who also opines that Brumfield suffers from mental retardation.  Dr. Swanson indicates that Brumfield's prior IQ scores, based upon pre-trial testing by Dr. Bolter and Dr. Jordan, were not correct because they were not adjusted to account for the "Flynn Effect."[15]  She also opines that Brumfield's rapid progression through different schools and residential facilities prevented his teachers and pupil appraisal teams from adequately assessing his progress and making referrals for additional evaluation when he did not progress.  Additionally, Dr. Swanson confirms that the IQ testing and adaptive skills assessment conducted by Dr. Weinstein are consistent with her analysis of Brumfield's historical records.[16]

- He was unable to perform simple tasks requiring visual-spatial coordination including lacing his shoes.
- He never learned to perform any tasks or activities that would lead to gainful employment.
- He could not follow instructions to the extent that prevented him from obtaining and keeping a job.
- He never lived independently, rented an apartment, entered into a contract, obtained a driver's license, saved money or opened a checking account.
- He has always been dependent on other individuals in order to function in society.

See, Brumfield's amended habeas petition, R. Doc. 30, pp. 30-31.

[15] The "Flynn Effect," which has not been accepted in the Fifth Circuit as scientifically valid, In re Salazar, 443 F.3d 430, 433, n. 1 (5th Cir. 2006), posits that, over time, the IQ scores of a population rise without corresponding increases in intelligence and thus the test must be re-normalized over time.  In re Mathis, 483 F.3d 395 (5th Cir. 2007).  Under the "Flynn Effect" theory, the passage of time inflates test scores by approximately one-third to two-thirds of a point per year since the test was normed.  The test scores are therefore reduced accordingly to account for that inflation over time.

[16] Specifically, Dr. Swanson states:

School and mental health records are consistent with these assessments and indicate these deficits were present prior to the age of 18 in at least four of the DM-IV-TR specified adaptive areas (communication, social/interpersonal skills, self-direction,

Finally, Brumfield now presents the opinions of Dr. James Merikangas ("Dr. Merikangas"), a neurologist and psychiatrist, who recently conducted a neurological physical examination of Brumfield and reviewed his historical records and recent reports. Dr. Merikangas' neurological examination of Brumfield did not disclose any acquired brain damage, ongoing disease, or mental illness, and he also renders a medical opinion that Brumfield suffers from mental retardation that existed before he was 18 years old.

In addition to the opinions of the above medical professionals regarding the three diagnostic criteria under the AAMR definition of mental retardation, Brumfield also introduces new evidence related to certain "risk factors" for mental retardation that he has, which Dr. Weinstein identified, specifically:  (1) a family history of mental retardation, in that Brumfield's mother had two siblings who receive SSI benefits for mental retardation; (2) Brumfield's premature birth and very low birth weight; (3) the use of psychotropic medication, such a Valium, on a daily basis by Brumfield's mother prenatally, in addition to very little prenatal care; and (4) Brumfield's exposure to extreme stress and physical and emotional abuse during his developmental years.

A comparison of the newly-presented evidence to the evidence Brumfield submitted in his state post-conviction proceedings indicates that Brumfield's case falls somewhere between the scenarios in *Morris* and *Moore*.  While Brumfield identified the AAMR criteria for mental retardation in his amended post-conviction relief application and submitted evidence as to his intellectual functioning and social and developmental background, the

functional academic skills) and the three AAMR 10th Edition adaptive areas of conceptual skills (receptive and expressive language, reading, writing, self-direction), social skills (interpersonal, responsibility, self-esteem, following rules), and practical skills (occupational skills, instrumental activities of daily living).

*See*, Brumfield's amended habeas petition, R. Doc. 30, p. 31.

28

evidence he supplied did not fulfill the AAMR criteria, and his counsel merely asserted a conclusory allegation that the criteria were satisfied.  Unlike the petitioner in *Morris*, Brumfield did not submit to the state court a sworn affidavit by an expert opining that, "given the opportunity and resources, intellectual tests would confirm" his mental retardation.

Nevertheless, Brumfield has been diligent and consistent in arguing his mental retardation claim since the *Atkins* decision was rendered in 2002, and his counsel, on at least three (3) occasions during his post-conviction proceedings, specifically requested sufficient funds for investigation into the facts and for the retention of experts, similar to the petitioner in *Morris*.[17]  Had such funding requests been considered and granted by the state

------

[17] On pages 1-6 of his amended habeas petition, Brumfield specifically discusses the fact that he was not given an opportunity to develop and uncover facts supporting his claims during his post-conviction proceedings, despite several requests to do so.  *See*, Original Application for Post-Conviction Relief; Expedited Motion for Order on Petition for Post-Conviction Relief; First Amended Petition for Post-Conviction Relief; and Application for Supervisory Writs to Louisiana Supreme Court.  He explains that he was represented by pro bono counsel during his state post-conviction proceedings, rather than by the Capital Post-Conviction Project of Louisiana ("CPCPL"), which receives funding from the Louisiana Indigent Defense Assistance Board ("LIDAB").  As a result, he did not have access to the funds of the LIDAB and had to litigate his requests for funding in the district court having jurisdiction over his post-conviction proceedings.

In December 2004, the Louisiana Supreme Court, in *State ex rel. Williams v. State*, 888 So.2d 792 (La. 2004), found that there may be statutory violations in the manner in which funding was being allocated by the LIDAB to indigent capital defendants in post-conviction proceedings and specifically noted its interest concerning the LIDAB's adoption of a resolution to prohibit the provision of funds for expert witnesses to civil law firms handling capital post-conviction cases on a pro bono basis.  Subsequent to *Williams*, the LIDAB implemented a rule setting forth guidelines for providing expert and investigative resources to all death row inmates, which now allows pro bono counsel representing death-sentenced inmates to acquire resources and funding needed for their cases.  *See*, La. Admin. Code Title 22, Part XV, §201, *et seq.* However, the *Williams* decision, rendered on December 1, 2004, and the subsequent LIDAB rule were not handed down until over a month after Brumfield filed this habeas matter on November 4, 2004.  Thus, in addition to the fact that the state trial court ignored Brumfield's requests for funding, Brumfield also did not get to take advantage of this change in the LIDAB's rules regarding funding in pro bono cases.  *See, State ex rel. Robertson v. Cain*, 947 So.2d 709 (La. 2007)(where the Louisiana Supreme Court remanded a case (that had been held in abeyance pending the evidentiary hearing on capital defendants' post-conviction funding requests in *Williams*) to the district court for further proceedings, after first allowing the defendant to seek funds from the LIDAB in accordance with La. Admin. Code Title 22, Part XV, §201, *et seq*).

29

trial court, Brumfield likely would have provided to the state court the information and evidence that he now seeks to present to this Court regarding his *Atkins* claim.  Instead, Brumfield's counsel's requests for expert funds were completely ignored by the trial court and never ruled upon prior to the trial court's denial of his post-conviction relief application, despite the fact that expert funding is permitted during post-conviction proceedings, particularly in capital cases.[18]  As noted above, *Atkins* was not decided until 2002, during the course of Brumfield's post-conviction proceedings; it was therefore reasonable at that juncture for Brumfield's counsel to request additional time and funding for investigation and consultation with experts on the mental retardation issue.  Thus, regardless of whether the newly-presented evidence regarding Brumfield's *Atkins* claim "fundamentally alters" the claim in comparison to how the claim was presented in state court (rather than merely "supplementing" the claim), the Court nevertheless finds that such new evidence should be considered because Brumfield has demonstrated "cause" for his failure to present the new evidence to the state court (*i.e.*, lack of funding for experts) as well as "actual prejudice" if he is not allowed the opportunity to introduce such evidence herein (If such claim is deemed unexhausted herein, Brumfield will be procedurally barred from going back

---

[18] *See, State ex rel. Cage v. Whitley*, 593 So.2d 375 (La. 1992)(staying execution to allow counsel the opportunity to make a showing of the need for expert assistance prior to filing a petition for post-conviction relief); *State ex rel. Deboue v. Whitley*, 592 So.2d 1287 (La. 1992)(ordering district court to provide funds for an expert to assist counsel in developing claims regarding mitigation of death-sentenced inmate, noting that petitioner is "entitled to an adequate opportunity to present his claim fairly"); *State v. Brown*, 566 So.2d 967 (La. 1990)(ordering that funds for experts must be provided before petition is filed so that petitioner can avail himself of assistance in developing post-conviction claims).

to state court and presenting his new evidence due to time bars under state law).[19] [20]

Accordingly, the Court finds that it is permitted to consider the additional evidence regarding Brumfield's *Atkins* claim contained in his amended habeas petition, and because he has now presented evidence sufficient to satisfy the three prongs of the AAMR definition of mental retardation and has thus established a prima facie case under *Atkins*, he is entitled to an evidentiary hearing on the issue of mental retardation.[21]  *See, Moore*, at 499 (After holding that the district court erred in finding that the petitioner's presentment of new evidence to the federal court rendered his *Atkins* claim unexhausted, the Fifth Circuit remanded the matter to the district court to conduct an evidentiary hearing on the merits of the petitioner's claim).  Prior to such evidentiary hearing being conducted, however, the State should be allowed the opportunity to conduct discovery and retain experts to rebut the *prima facie* case submitted by petitioner.

### (B)   The State's "relation back" argument concerning the claims in Brumfield's amended habeas petition:

---

[19] *See, Moore*, at 223, citing *Hillery*, 474 U.S. at 260, 106 S.Ct. 617("The failure to exhaust is a procedural bar to federal review that may be excused if the petitioner can demonstrate cause for the defaults and actual prejudice"); *Barrientes v. Johnson*, 221 F.3d 741, 758 (5th Cir. 2000)(A petitioner can also overcome a procedural default if he can show that "failure to consider the claims will result in a fundamental miscarriage of justice").

[20] The Court also notes that it has not been presented with any evidence suggesting that Brumfield "attempted to expedite federal review [of his *Atkins* claim] by deliberately withholding essential facts from the state courts."  *Moore*, at 496.  Because of a lack of funding, Brumfield did not have access, while in state court, to the "essential facts" concerning his *Atkins* claim that he now seeks to present herein -- another factor which mitigates in favor of allowing him to present new evidence to this Court.

[21] A court may grant an evidentiary hearing under 28 U.S.C. §2254(e) within its discretion when an applicant demonstrates that a factual predicate underlying his claims could not have been previously discovered through the exercise of due diligence, as in this case where the state trial court did not allow Brumfield the funding and opportunity to investigate his mental retardation claim during post-conviction proceedings.  *See also, Koon v. Cain, et al*, No. 01-327-D, where this Court found that the fault for a petitioner's failure to establish the facts he sought to prove during state post-conviction proceedings rested with the trial court, not with the petitioner, and that the allegations regarding the errors in lawyering, if proven, were serious enough to warrant the attention at a hearing in federal court.

The State also opposes Brumfield's amended habeas petition on the ground that the claims asserted in that petition do not "relate back" to his original habeas corpus petition filed nearly three years ago for purposes of timeliness under AEDPA.  However, that argument lacks merit.  In support of its "relation back" argument, the State relies upon *Mayle v. Felix*, 545 U.S. 644, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005).  In that case, a petitioner, who was convicted in a California state court timely filed an initial habeas application in federal court asserting a Confrontation Clause challenge to the admission of a videotaped prosecution witness's testimony.  Then, over five months after the expiration of AEDPA's one year time limit, the petitioner filed an amended habeas petition asserting an entirely different claim, a Fifth Amendment objection to the admission of certain inculpatory statements he had made during pretrial police interrogation.

The Supreme Court noted that Fed. R. Civ. P. 15(c)(2) provides that pleading amendments "relate back" to the date of the original pleading when the claim asserted in the amended pleading "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."  It further explained that the majority of Circuits define "conduct, transaction, or occurrence" to allow "relation back" only when the claims added by the amendment "arise from the same core facts as the timely filed claims," and not when the new claims depend upon events separate in "both time and type" from the originally raised episodes.  The court therefore found that the petitioner's own pretrial statements, newly raised in his amended petition, did not relate back to the filing date of the original petition, which concerned a prosecution witness's videotaped statements because the two claims were separated in both time and type.

By contrast, although Brumfield seeks to add new evidence relative to his *Atkins* claim through his amended habeas petition, such evidence nevertheless relates to the

claim that he presented in his original habeas petition, and both the *Atkins* claim in his original habeas petition and the *Atkins* claim in his amended habeas petition concern the same event in time, *i.e.*, the trial court's decision to deny him a hearing on the issue of mental retardation.[22]   Accordingly, because this case is distinguishable from *Mayle*, the claims in Brumfield's amended habeas petition "relate back" to the filing date of his original habeas petition.

> **(C)    Should the Court consider the newly-presented evidence relating to Claim Nos. 2 (lethal injection claim) and 3 (coerced confession claim) of Brumfield's amended habeas petition?**

Even if the claims in Brumfield's amended habeas petition "relate back" to the filing date of his original habeas petition, the Court nevertheless finds that it should not consider the additional evidence concerning the second and third claims asserted in Brumfield's amended habeas petition because such additional evidence certainly does "fundamentally alter" those claims as compared to how they were presented in state court.   Relative to both of those claims, in state court, Brumfield submitted only a single paragraph of conclusory allegations in his post-conviction relief applications with no evidentiary or jurisprudential support.   He did the same in his initial habeas petition filed with this Court. However, in his amended habeas petition, Brumfield provides twenty-nine pages of argument concerning his lethal injection claim and four pages relative to his coerced confession claim.   Additionally, he refers to extensive legal research and evidence, which

---

[22] Similarly, even though Brumfield seeks to introduce new evidence relative to Claim Nos. 2 and 3 of his amended habeas petition (*i.e.*, his claims that lethal injection violates the Eighth Amendment and that his conviction and sentence were obtained with a coerced confession), he nevertheless asserted those claims at pages 35 and 37 of his original habeas petition).

could have been obtained by his state post-conviction counsel without the necessity of expert assistance (as distinguished from his *Atkins* claim, where expert assistance was needed to fully develop his arguments for post-conviction relief).  Certainly, in the over three years of time between the filing of his initial and amended applications for post-conviction relief, his state counsel could have investigated and accumulated much of the information contained in his amended habeas petition for the state court's review.  For example, as the State explains in its present opposition, the *Code v. Cain* case upon which Brumfield relies heavily in his amended habeas petition relative to the lethal injection issue went to evidentiary hearing in 1999.  However, Brumfield's state counsel failed to address the *Code* claims in Brumfield's 2000 and 2003 post-conviction relief applications, and Brumfield failed to reference that case in his 2004 habeas application with this Court.  Other medical, jurisprudential, and historical evidence cited in support of Brumfield's lethal injection claim also appears to have been available at least prior to the filing of his amended post-conviction relief application in 2003.

As to Brumfield's coerced confession claim, references are simply made to information contained in the trial transcript, which was certainly available to Brumfield's post-conviction counsel.  Although Brumfield's present counsel contends that he has been unable to obtain records from two *ex parte* hearings for funding involving a forensic audio analyst because of the necessity of a court order, such hearings occurred in 1993, and that information therefore also could have been obtained by post-conviction counsel had he requested it.  Accordingly, the Court finds that the additional evidence relative to the final two claims in Brumfield's amended habeas application was not fairly presented to the state court for consideration (not exhausted) and therefore will not be considered by this Court,

34

and as explained above, such claims (which, in the original habeas petition, were part of Claim No. 5, alleging cumulation of error), should be dismissed as procedurally barred.[23]

**(D)    Claim No. 3 of Brumfield's original habeas petition:  Ineffective Assistance of Counsel:**

The "clearly-established federal law" that applies to Brumfield's claim of ineffective assistance of counsel is the U.S. Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).   Based upon the standards set forth in *Strickland,* the court has no authority to grant habeas corpus relief if it concludes only that, in its independent judgment, the state court's application of *Strickland* is erroneous or incorrect. *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002). Instead, the question is whether the state court's decision involved an unreasonable application – and not merely an incorrect application of *Strickland*. *Id.*

In *Strickland*, the Supreme Court held that a petitioner who claims ineffective assistance of counsel must affirmatively demonstrate both that:

(1)    his counsel's performance was "deficient", i.e., that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and

(2)    the deficient performance prejudiced his defense, i.e., that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial where the result is reliable.

466 U.S. 668, 686, 104 S.Ct. 2052, 2064.

_____

[23] Since the Court has determined that Claim Nos. 2, 4, and 5 of Brumfield's original habeas petition should be dismissed as procedurally barred, that Claim No. 1 of Brumfield's original and amended habeas petitions (*i.e.*, his *Atkins* claim) requires an evidentiary hearing, and that the evidence accompanying Claim Nos. 2 and 3 of Brumfield's amended habeas petition should not be considered, the only remaining claim for the Court to address is Claim No. 3 of his original habeas petition concerning his allegations of ineffectiveness of counsel.

To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards. *E.g.*, *Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir. 1986).  The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy.  *E.g.*, *Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988).  The court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial.  *Martin*, 796 F.2d at 817.  Great deference is given to counsel's exercise of his professional judgment.  *Bridge*, 838 F.2d at 773; *Martin*, 796 F.2d at 816.  The court essentially must determine whether there was a gap between what counsel actually did and what a reasonable attorney would have done under the circumstances. *Neal v. Puckett*, supra.

If the petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless must affirmatively demonstrate prejudice from the alleged errors.  *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988).  To satisfy the prejudice prong of the *Strickland* test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding.  *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067.  Rather, the petitioner must show there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.  *Martin*, 796 F.2d at 816.  The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case, he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome." 796 F.2d at 816-17.

36

Brumfield's various allegations of ineffective assistance of counsel in Claim No. 3

of his original habeas petition were reviewed in detail by the state court at the post-

conviction relief hearing, at which time the trial judge made the following findings:

> Claim Number 3 is ineffective assistance of counsel . . . and is actually broken down into several sub-parts. The first part being that the penalty phase counsel was not properly qualified for the trial of this case. In support of that in the application the defendant claims that – or actually quotes Marty White as the defense attorney talking about this being his first capital case. The record's clear that trial counsel was Ed Greenlee and Tyrone Brown, and even though Marty White was in it for a while he did withdraw and was replaced by Tyrone Brown. Therefore, that claim is without merit and definitely does not meet the Strickland standard. In Section A, the application also argues that it was ineffective assistance of counsel because trial counsel argued against the death penalty instead of presenting mitigating evidence. The record's clear there was mitigation evidence presented, and it's true the defense attorney did argue against the death penalty. The court sees that as a strategic decision on the part of the defense attorney and, therefore, that would not meet Strickland. It does not state a claim that would entitle the petitioner to relief, so that is also dismissed. Section B, entitled counsel failed to investigate and prepare to offer mitigation evidence. However, I read the record or parts of the record and it's real clear that mitigation evidence was presented. There were six witnesses, two experts, his mother, his brother, his father, his, I think, fourth grade or second grade teacher, and it was probably as much mitigation evidence in that case as any I've seen.
>
> Again, that's not supported by the record, and, therefore, it does not state a claim that would entitle him to relief and definitely does not meet the Strickland standard. Therefore, that one is dismissed. In Subsection B there was also a claim that counsel presented no information about how the defendant might cope with incarceration, and that was unsuccessfully argued on appeal and, therefore, it is barred. Section 3 of ineffective assistance of counsel entitled counsel completely failed to present mitigating evidence. Again, six witnesses, the record shows there was other – or there was mitigating evidence including Dr. Bolter, Dr. Guinn, the mother, brother, the father, and the teacher, and, therefore, that is unsupported

37

and will be dismissed being without merit.

Section D entitled counsel presented an unacceptable and irrelevant argument in the penalty phase.  This is that – the debate of the argument is that the defense attorney should have argued more about mitigating factors and less about the death penalty in general.  Again, this is strategy and definitely would not meet the Strickland standard and, therefore, is dismissed.

Section E is counsel failed to rehabilitate the social worker on the issue of her attitude toward the death penalty.  This is another matter that goes to strategy, and I read this and I kind of wondered.  I'm not sure whether that's even possible that she could be rehabilitated on the death penalty.  The fact that she is against it, she is against it.  She is sworn to tell the truth and I assume she tells the truth, and whether or not she is for or against the death penalty, I'm not sure how that would affect her testimony on the stand and the information that she relayed to the jury.  In any event, that's something that would not meet the Strickland standard, and, therefore, it's dismissed.  And actually it's a strategy matter, so I'm not sure it's even ineffective assistance at all.

Subsection F entitled counsel failed to ensure a complete record of the trial court proceeding.  This was raised on appeal, and the Supreme Court found that counsel failed to show any prejudice from the bench conferences not being on the record, and no evidence was listed in the petition indicating how the defense was prejudiced by this.  So I'm going to agree with the Supreme Court on this.  That's procedurally barred.  It's already been handled on appeal, so it will be dismissed.

Subsection G, counsel failed to oppose and/or object to improper evidence offered by the state during the penalty phase.  This has already been litigated on appeal, and the Supreme Court found that it was appropriately introduced by the State.  So Subsection G, that claim is dismissed.

Subsection H, failed to raise issue of mental incapacity.  From reviewing the record, those same reports, Dr. Bolter's report in particular, there is no evidence of incapacity, and since there is none, I'm not sure why any attorney would raise it if there is no evidence to support it.  Therefore, that also – Subsection H, that claim will be dismissed.

38

> Subsection I claims that the defense attorney failed to conduct proper examination of jurors. Cross-examination again is something that is really related to strategy, and I'm not sure specifically what the problem is or what the alleged problem with the cross-examination – or I should say proper examination of the jurors. Although the record, I believe there was two weeks of voir dire and I can't remember how many pages of testimony taken, and it does appear that they were pretty aggressive in examining the jurors. I fail to see how the defense was prejudiced at all. It definitely does not meet the Strickland standard and, therefore, the claim in Subsection I is also dismissed.

*See,* Post-Conviction Relief Hearing transcript, Pages 4-7, 10.

The Court will now consider whether the trial court's determinations at Brumfield's post-conviction hearing were unreasonable in light of the standards set forth in *Strickland.* In his first claim, Brumfield contends that his penalty phase counsel, Marty White, lacked experience in trying capital cases. In support of that contention, Brumfield quotes a portion of the transcript from an *ex parte* hearing that occurred on April 28, 1993, Vol. III, p. 609, where Mr. White indicated that he would "cut his teeth" on Brumfield's case because it was his "first capital case." However, the Court's review of the record indicates that Mr. White did not serve as Brumfield's counsel at trial or during the sentencing proceedings. The sentencing hearing transcript reflects that Brumfield was actually represented at that hearing by Edward Greenlee and Tyrone Brown.[24] Accordingly, Brumfield's argument in

---

[24] Edward Greenlee was one of the defense attorneys appointed to represent Brumfield after Michael Mitchell informed the Court that he had a personal conflict with the case. *See*, Motion for Appointment of Additional Counsel filed 1/20/93. Greenlee began representing Brumfield as early as his arraignment in February 1993. Marty White actually withdrew from the case, and Tyrone Brown was then appointed as additional defense counsel for Brumfield. Brown was present in court representing Brumfield as early as July 1993. Brown and Greenlee represented Brumfield during both the guilt and sentencing phases of his trial.

this regard lacks merit and does not meet the *Strickland* standard, as the trial court concluded.

Brumfield next claims that his counsel was ineffective because he argued against the death penalty during the sentencing phase rather than presenting mitigating evidence. The Court agrees with the state court's conclusion that Brumfield's counsel's decision to argue against the death penalty is a matter of strategy and does not fall below an objective standard of reasonableness as is required to find deficient performance under *Strickland.* Furthermore, the Court's review of the record indicates that defense counsel presented mitigating evidence during the penalty phase, including the testimony of Dr. Bolter and Dr. Guin, that of Brumfield's various family members, and that of his teacher, Karen Cross. As discussed in detail above, defense counsel elicited from those witnesses mitigating evidence, including but not limited to information regarding Brumfield's intelligence level, his disruptive homelife, potential abuse and neglect, his low birth weight, and his educational history. Defense counsel's performance is not deficient simply because the jury did not find such evidence sufficiently persuasive to impose life imprisonment rather than the death penalty. Accordingly, the Court concludes that this claim is likewise without merit and should be dismissed.

Because the Court finds that defense counsel's decision to make general arguments regarding the death penalty in the penalty phase was a strategic decision under *Strickland* and that defense counsel presented adequate mitigating evidence during the penalty phase,[25] the Court also finds that Brumfield's contention that he was denied effective

---

[25] The Court's review of defense counsel's argument during the penalty phase indicates that counsel made arguments beyond general assertions of the wrongfulness of imposing the

assistance of counsel because his counsel presented an "unacceptable and irrelevant argument in the penalty phase" should also be dismissed.

As to Brumfield's claim that his counsel was ineffective because he failed to rehabilitate Dr. Guin on the issue of her attitude with regard to the death penalty, the Court agrees with the trial judge's determination that this was a tactical decision on the part of Brumfield's penalty phase counsel.  During the penalty phase, Dr. Guin indicated that she believed the death penalty to be "ineffective" because it "gets rid of the person that's been convicted of the crime."  Vol. XVI, p. 109.  A review of the record indicates that Brumfield's counsel actually tried to ask questions of Dr. Guin regarding the death penalty issue on re-direct and was not permitted to do so by the trial court.  Thus, technically, any failure on his part to ask further questions or "rehabilitate" Dr. Guin on that issue was not a result of deficient performance on his part.

---

death penalty in Brumfield's case and, in fact, discussed a number of mitigating factors with the jury.  He asked the jury to consider Brumfield's family and children and how the imposition of the death penalty would affect them; he pointed out why the expert testimony should lead to a sentence of life imprisonment rather than death; he reemphasized expert testimony indicating that Brumfield had memory and attention problems and a borderline IQ; he scrutinized the testimony of certain State witnesses; he pointed out that Brumfield was never convicted with regard to the 1989 shooting related to a drug deal; he discussed Brumfield's background, including abuse by his stepfather, having six stepfathers, being placed in fourteen schools, being placed in group homes from the age of 12, the types of medication Brumfield received at a young age, being born at a low birth weight and with "problems," issues relating to the break-up of his parents; the fact that Brumfield's mother was also from an abusive home and had an emotional detachment from her children; the fact that Brumfield's father was unable to give Brumfield the attention and direction that he needed because of "things in his life;" that Brumfield had "good sides" to him, such as "taking up for the underdog;" and the alleged decreasing level of disciplinary reports while Brumfield was in parish prison.  Vol. XVI, pgs. 165-173.  In sum, defense counsel did not simply make the argument that the death penalty is wrong, as Brumfield contends; he instead argued that the death penalty was not the appropriate punishment for Brumfield considering the various mitigating factors at issue.  Such an argument is a strategic decision and could have been effective if the Court had found the mitigating evidence to be sufficiently persuasive.

Furthermore, the Court agrees with the state trial court that this was not necessarily an issue upon which Dr. Guin needed to be "rehabilitated."  The fact that Dr. Guin felt the death penalty is an "ineffective" method of punishment did not result in her being a less credible witness with regard to her evaluation of Brumfield's social history.  She was not permitted to give an opinion as to whether or not she thought Brumfield should be sentenced to death; thus, she did not need to be rehabilitated regarding her opinion as to the effectiveness of that punishment.  Finally, even if the failure to rehabilitate Dr. Guin regarding her opinion on the death penalty could be considered deficient performance by Brumfield's counsel, the Court finds that such conduct was not so significant to prejudice Brumfield's defense or so serious as to deprive him of a fair trial during the penalty phase, as is required to find ineffective assistance of counsel under *Strickland*.

With regard to Brumfield's allegation that his counsel was ineffective for failing to insure that a complete record of the trial court proceedings was produced, this issue was raised on appeal and fully considered by the Louisiana Supreme Court.  Specifically, Brumfield complains about the failure of the trial court to transcribe several bench conferences which took place during the cross-examination of Eddie Paul (a cousin of Brumfield's co-perpetrator who alerted authorities about Brumfield's involvement in the murder) and during defense counsel's examination of an employee of the Louisiana State Police Crime Lab.[26]  The Louisiana Supreme Court noted that a new trial may be ordered

---

[26] The first unrecorded conference during Paul's testimony occurred when defense counsel suggested that the witness may have been previously incarcerated on charges other than those dealing with his failure to pay child support.  After the conference, Brumfield's counsel abandoned the issue.  The second conference occurred when the prosecutor objected to defense counsel's reading into the record a statement that Paul had given to the police because she had not been allowed to review the statement before it was read to the jury.  The

when "*material* portions of the trial record were unavailable or incomplete; however, a 'slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal' does not require reversal of a conviction."  *See, State v. Brumfield*, 737 So.2d 660, 669 (La. 1998), quoting *State v. Parker*, 361 So.2d 226 (La. 1978).  As to the bench conferences during Paul's testimony, the court concluded those conferences primarily concerned the relevancy of defense counsel's questions which did little to impeach Paul's testimony, and because the defendant failed to show that he was prevented from presenting any relevant evidence as a result of the unrecorded conferences, he did not establish prejudice.  Relative to the conferences during the crime lab witness's testimony, the court noted that the witness ultimately answered defense counsel's questions, despite the conferences; thus, Brumfield again failed to demonstrate

---

third conference occurred during cross-examination of Paul after defense counsel asked him if he remembered telling the police that nobody planned the crime at his residence, and Paul indicated that he could not have told the police that.  When defense counsel began to read from Paul's recorded statement, the prosecutor objected, claiming that the portion of the transcript being read by defense counsel was not responsive and therefore did not impeach the witness's testimony.  Following the conference, defense counsel did not pursue the alleged discrepancy between the witness's statement and his trial testimony.  A fourth unrecorded conference occurred after defense counsel asked Paul if the police threatened to whip him when they arrested him in connection with the offense, and defense counsel again abandoned the issue after the conference.  Two other unrecorded conferences occurred during Paul's testimony when the prosecutor objected to defense counsel's questions about events following Paul's arrest, asserting that they were irrelevant and lacked impeachment value.

The first unrecorded bench conference during the examination of the Louisiana State Police Crime Lab witness occurred after defense counsel asked the witness if he had an opinion about whether any .25-caliber bullets struck either of the victims.  The State objected, asserting that the witness was not qualified to respond to the question, and the court sustained the objection following an unrecorded sidebar.  Subsequently, defense counsel rephrased the question, and the expert responded.  The second unrecorded conference took place in response to an objection by the prosecution to the witness's reading from a list of exhibits in order to testify which pieces he had examined.  Following the conference, the witness testified that several of the items seized by the police were recognized as being irrelevant to the investigation.

that any prejudice resulted from the failure to record the conferences.  The Court finds that the Louisiana Supreme Court's conclusions in that regard are reasonable, and this claim should therefore also be dismissed for failure to demonstrate the prejudice prong of the *Strickland* standard.

Brumfield next claims that his counsel was ineffective in failing to oppose and/or object to improper evidence offered by the State during the penalty phase, including evidence of uncharged criminal conduct and "arguments of the State unsupported by any evidence."  Brumfield argues that the State proceeded to present testimony of a victim of an armed robbery to which the defendant had pled and to characterize Brumfield's "clicking" of a gun against that victim's head as a "misfire."  Brumfield contends that his counsel was ineffective for failing to object to the victim's testimony or to the characterization of a "misfire."

Brumfield also argues that, when the Clinton Police Chief testified with regard to that armed robbery incident, the "limits of admissible other conduct evidence in the penalty phase were stretched beyond the breaking point," as the Police Chief testified that there had been a confession in that case and that Brumfield's assertions that the confession was coerced were false.  Finally, Brumfield argues that his counsel should have objected to certain arguments that the State made in its closing arguments during the penalty phase, specifically the State's argument that the Motions to Suppress filed by Brumfield with regard to the armed robbery case and the present case were a basis for the death penalty, the argument that the armed robbery victim would have been killed but for a "misfire," and the argument that Brumfield had killed a drug dealer in 1989.

44

As noted by the trial judge, defense counsel's failure to object to the evidence and arguments made by the State is an issue which has already been presented and fully litigated on appeal, and the Louisiana Supreme Court found that the State's arguments and evidence were not improper.  The Louisiana Supreme Court specifically stated the following with regard to the State's arguments concerning Brumfield's motions to suppress and Brumfield's confession related to the armed robbery case:

> In the present case, the prosecutor did not suggest that defendant or his attorney did anything improper in attempting to suppress the confession in the earlier case.  Rather, the prosecutor pointed to record evidence that this case was not the first one in which defendant had unsuccessfully claimed a confession was coerced.  Because the jury had already rejected defendant's claim of a coerced confession in the guilt phase of this case, we conclude that the comments about defendant's claim of a coerced confession in a different case did not inject an arbitrary factor into the jury's deliberations during the penalty phase.  Furthermore, the prosecutor's statement about defense counsel's cross-examination of police officers was a fair comment pointing out the frequently used strategy of attempting to shift the focus from the accused to the accuser.

*State v. Brumfield*, 96-2667, (La. 1998), 737 So.2d 660, 666.  Because it has been determined that the prosecutor's conduct was not improper, the performance of Brumfield's counsel in failing to object to such proper conduct cannot be considered deficient.

Brumfield next contends that he was denied effective assistance of counsel because the issue of his mental capacity to proceed was never raised by his counsel.  As support for this argument, he points out that Dr. Bolter wrote in his narrative report that there was a question as to whether defendant was "able to assist in his defense" and recommended that "it may be reasonable to treat [Brumfield] with an appropriate stimulant medication in order to maximize his capacity to attend."  Vol. II, p. 276.  A review of Dr. Bolter's narrative

45

report indicates that those statements have been taken out of context by the defendant.

The full context of Dr. Bolter's comments are as follows:

> The issue of [Brumfield's] attentional difficulties also seems to be suggestive of an early attention deficit/hyperactivity disorder that is a combined type.  This condition is not severe enough to interfere with his ability to assist counsel in his own defense.  However, his attentional skills may be somewhat taxed during monotonous or repetitive courtroom activities and it may be reasonable to treat this patient with an appropriate stimulant medication in order to maximize his capacity to attend.
>
> Additionally, the results of the Georgia Competency Test yielded a raw score of 40, suggesting that he has adequate simple knowledge of the courtroom and proceedings, as well as the charges, consequences and recollection of the events leading up to his arrest to be judged competent for trial.  The Bennett criteria were also reviewed and he has an awareness of the nature of the proceeding against him and the ability to assist in his own defense.  No other specific accommodations need be made in considering his current capacity to assist counsel.

Vol. II, p. 276.  Based upon the explicit language of Dr. Bolter's report, Brumfield had the mental capacity to proceed at trial, and there is no evidence in the record indicating that Brumfield was unable to assist his counsel prior to or during trial.  The fact that stimulant medications may have been recommended to improve Brumfield's attention span during trial did not indicate that he was incompetent or unable to understand and assist in the proceedings against him.  Because no evidence of incompetency exists, the failure of Brumfield's counsel to raise such an issue is not deficient conduct under *Strickland.*

Finally, Brumfield argues that his counsel was ineffective for failing to conduct a proper examination of prospective jurors during voir dire.  He contends that there was a "wholesale lack of interaction with prospective jurors on the question of the death penalty," that jurors were not given "any information on statutory mitigators to determine whether

individual prejudice would prevent or impair them from being considered," and that prospective jurors were not asked "whether the offense itself, without regard to the character and propensities of the defendant, would cause them to automatically vote for a death sentence."

Voir dire in the trial court proceedings occurred from June 12, 1995 through June 26, 1995, and the voir dire transcript indicates that jurors were thoroughly questioned regarding their opinions as to the death penalty and advised about statutory mitigators.[27] In view of this questioning, the Court does not find that defense counsel's conduct during voir dire was deficient, and this claim should likewise be dismissed for failure to meet the standards set forth in *Strickland*.

In sum, the Court finds that, with the exception of Brumfield's claim that he was entitled to an evidentiary hearing on the issue of mental retardation, the presumed

---

[27] The Court has closely reviewed the voir dire proceedings contained in the state court transcript and finds that the prospective jurors were more than adequately advised and questioned regarding the law and burden of proof pertaining to the charge of first degree murder and for the imposition of the death penalty. The areas of discussion/questioning included but were not limited to: the prospective jurors' opinions concerning capital punishment; a detailed explanation of the legal requirements for imposition of the death penalty (including the State's burden of proving at least one aggravating factor and the obligation to consider mitigating evidence); the fact that, even if an aggravating circumstance is proven, the law does not require imposition of the death penalty; specific discussion of mitigating factors and the benefits of a life sentence over the death penalty; thorough discussion of the reasonable doubt burden of proof and the presumption of innocence; discussion of prospective jurors' general feelings on crime in the community (attendance at community crime watch meetings) and regarding police; the impact of the State's failure to present the murder weapon as evidence; issues relating to credibility of police officers as witnesses and the coercion of confessions; the difference between circumstantial and direct evidence; the defendant's right to remain silent and not testify or present any evidence at trial; the impact of the length of deliberations in a capital case; the prospective jurors' opinions regarding a defendant's acquittal based upon a "technicality" or "loophole;" general feelings about the justice system and attorneys; the prospective jurors' ability to put aside information they received through the news media or their preconceived notions regarding the crime and/or Brumfield's guilt at the time of deliberations and consider only the evidence presented at trial; and any relationships the prospective jurors had to the victim, the victim's family, or potential witnesses.

correctness of the state court's decisions on his remaining claims regarding ineffective assistance of counsel has not been rebutted. Brumfield has failed to present clear and convincing evidence that, in adjudicating those remaining claims, the state court unreasonably applied federal law and/or unreasonably determined the facts in light of the evidence presented in his state court proceedings. *See*, 28 U.S.C. 2254(d)(1)-(2) and (e)(1). Accordingly, Brumfield's ineffective assistance of counsel claims should be dismissed.

## RECOMMENDATION

For the above reasons, it is recommended that the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (R. Doc. 1) filed by petitioner, Kevan Brumfield, be **GRANTED IN PART**, in that petitioner is entitled to an evidentiary hearing relative to his *Atkins* claim, and **DENIED IN PART**, in that all of the petitioner's remaining claims should be dismissed with prejudice. It is further recommended that, prior to an evidentiary hearing being conducted relative to petitioner's *Atkins* claim, the State be allowed the opportunity to conduct discovery and retain experts to rebut the *prima facie* case submitted by petitioner.

Signed in chambers in Baton Rouge, Louisiana, April 15, 2008.

_____

**MAGISTRATE JUDGE CHRISTINE NOLAND**