UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

KEVAN BRUMFIELD

CIVIL ACTION

VERSUS

NO. 04-787-JJB-CN

BURL CAIN, Warden,
Louisiana State Penitentiary

## RULING ON PETITION FOR WRIT OF HABEAS CORPUS

Before the Court is Kevan Brumfield's petition for a writ of habeas corpus filed against Burl Cain, the warden of the Louisiana State Penitentiary in Angola, Louisiana. Brumfield asks this Court to declare him mentally retarded and ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). (Docs. 111, 121). His petition is opposed by the State of Louisiana. (Doc. 118). The Court held an *Atkins*[1] evidentiary hearing on the issue of petitioner's mental retardation[2] on July 12-16 and August 3-4, 2010.

## I.

Petitioner Kevan Brumfield was convicted in Louisiana state court of the 1993 murder of a Baton Rouge police officer and sentenced to death by a jury in 1995. *State v. Brumfield*, No. 1-93-865 (19th Judicial District Court, East Baton Rouge Parish, Louisiana) (Tyson, J.). The Louisiana Supreme Court affirmed his conviction on direct appeal. *State v. Brumfield*, 737 So.2d 660 (La. 1998). The United States Supreme Court denied his petition for a writ of certiorari. *Brumfield v. Louisiana*, 526 U.S. 1025 (1999).

---

[1] *Atkins* hearings assess evidence of a person's intellectual functioning, adaptive skills, and personal history to determine whether the person is mentally retarded.
[2] The term "mental retardation" has fallen out of favor with clinical psychologists, some of whom now prefer the term "intellectual disability." However, because the relevant statutes and precedents speak in terms of mental retardation, the Court does so as well. *See State v. Corey Williams*, 831 So. 2d 835, 838 n.2 (La. 2002), *superseded by statute in part by* La. C.Cr.P. art. 905.5.1 (describing the court's deference to existing terms in the evolving forensic psychology field).

Brumfield is in the custody of the State of Louisiana by virtue of his incarceration at the Louisiana State Penitentiary in Angola. In 2000, he filed for post-conviction relief in Louisiana state court, alleging among other things that he has was ineligible for execution by reason of insanity and mental incompetency. *State of Louisiana ex rel. Brumfield v. Cain*, No. 1-93-865 (19th Judicial District Court, East Baton Rouge Parish, Louisiana). Brumfield's petition relied on evidence submitted at his sentencing hearing. (*See* Post-Conviction Petition, Vol. PC).[3]

On June 16, 2003, within a year of the date the Supreme Court barred executing mentally retarded persons in its 2002 *Atkins* decision, Brumfield amended his state post-conviction petition, asserting an *Atkins* claim for the first time. (Amended Post-Conviction Petition, Vol. PC). The State filed an answer, arguing that the evidence from the penalty phase of the trial on which Brumfield relied was insufficient to state a *prima facie* case necessary to trigger an *Atkins* evidentiary hearing. (Answer to Amended Petition, Vol. PC, pp. 1-6). On September 23, 2003, Brumfield replied to the State's answer, contending the State's response for denying an evidentiary hearing did not comport with precedent. (Brumfield's Reply to State's Answer to Amended Petition, Vol. PC, pp. 1-2).

The state habeas court tasked with assessing Brumfield's post-conviction petition denied him an evidentiary hearing on the *Atkins* issue. (Transcript of State Post-Conviction Hearing on October 23, 2003, Vol. PC, p. 2) (Anderson, J.)). In so doing, the state habeas court mooted Brumfield's pending requests for funding to develop his *Atkins* claim. (*See* Initial State Court Petition for Post-Conviction Relief, Vol. PC, ¶¶ 32(p), 36-37 (describing lack of funds to retain experts to conduct neurological examinations of Brumfield); Expedited Motion for Order on

---

[3] The entirety of the state court record (Doc. 3) is available only in hard paper form. The trial on the guilt and sentencing phase is catalogued in 16 volumes (cited as, *e.g.*, "Vol. IV," etc.). Several supplementary volumes detail the docket activity prior to and after trial. Finally, a post-conviction volume (cited as "Vol. PC") contains the record from Brumfield's state habeas proceedings.

Petition for Post-Conviction Relief, Vol. PC, ¶¶ 3-7; Amended State Court Petition for Post-Conviction Relief, Vol. PC, ¶¶ 104-05) (seeking funds to retain experts for evaluating Brumfield in variety of areas); Reply to State's Answer to Amended Petition, Vol. PC, ¶ 10 (reiterating need for expert funding)). At the same hearing, the state trial court summarily denied Brumfield's petition in its entirety. (Transcript of State Post-Conviction Hearing on Oct. 23, 2003, Vol. PC, pp. 1-16). The Louisiana Supreme Court likewise denied review of the state habeas judge's rulings. *State ex rel. Brumfield v. Cain*, 885 So.2d 580 (La. 2004).

On November 4, 2004, petitioner timely filed his petition for a writ of habeas corpus in this Court. (Doc. 1). On November 1, 2007, petitioner amended his petition after finally receiving funding to develop certain of his habeas claims for relief, including his *Atkins* claim. (*See* Doc. 30, pp. 1-6 (recounting the various failures of the Louisiana Indigent Defense Assistance Board, Brumfield's previous counsel, to provide adequate funding, as recognized by the Louisiana Supreme Court in *State ex rel. Williams v. State*, 888 So.2d 792 (La. 2004)). Following answers by the State, the magistrate judge issued a report and recommendation that Brumfield's habeas petition be denied in full except to the extent that Brumfield was entitled to an evidentiary hearing on his *Atkins* claim. (Doc. 37).

Following objection by the State and oral argument on the issue, this Court approved and adopted the magistrate judge's report and recommendation in full. (Doc. 43). The Court then held its *Atkins* evidentiary hearing from July 12-16 and August 3-4, 2010. Petitioner filed his post-hearing brief (Doc. 111), the State filed its opposition brief (Doc. 118), and petitioner filed a reply brief (Doc. 121) on November 21, 2011, which submitted the matter to this Court.

## II.

Despite having already held an evidentiary hearing on petitioner's *Atkins* claim, the State asserts newly-decided cases of the Supreme Court of the United States and the United States Court of Appeals for the Fifth Circuit have changed the law and altered the propriety of that action. Because such a claim, if true, would preclude reaching the merits of petitioner's *Atkins* claim, the Court proceeds to address this matter. The Court will treat the State's briefing on the issue as a motion for reconsideration in light of the newly-issued decisions.

A. The Magistrate Judge's Report and Recommendation Adopted by This Court

The magistrate judge's report and recommendation (Doc. 37) outlined the reasons for granting petitioner an *Atkins* hearing. Because Brumfield's sentence pre-dated *Atkins* and his post-conviction application in state court relied on evidence introduced at Brumfield's sentencing hearing, the magistrate judge assessed that evidence and agreed with the state habeas judge that Brumfield failed to meet his burden of presenting sufficient facts to put his mental retardation at issue. (Doc. 37, p. 20). Furthermore, the magistrate judge, citing *Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005)[4], raised but did not decide whether the newly-presented evidence of mental retardation in Brumfield's federal habeas petition "merely supplemented" rather than "fundamentally altered" his mental retardation claim under the exhaustion requirement. (*Id.* pp. 22-31). Instead, the report concluded that petitioner's failure to adequately develop his claims in state court resulted from the state court's refusal to grant him funds to develop expert testimony necessary to substantiate his *Atkins* claim. (*Id.* pp. 30-32). The magistrate judge found that Brumfield's diligence in consistently pressing his *Atkins* claim in the state habeas court, coupled

---

[4] *See also Moore v. Quarterman*, 491 F.3d 213 (5th Cir. 2007); *Kunkle v. Dretke*, 352 F.3d 980 (5th Cir. 2003); *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003); *Dowhitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) (cases determining whether evidence in a federal habeas petition "fundamentally altered" or "merely supplemented" a claim from state habeas proceedings for purposes of AEDPA's exhaustion requirement).

with the state court ignoring his multiple requests for funding for expert assistance in developing his claim, satisfied the cause and prejudice test. (*Id.*). Moreover, because the magistrate judge found the additional evidence contained in Brumfield's amended federal habeas petition constituted a *prima facie* showing under *Atkins*, the report recommended this Court conduct an evidentiary hearing. (*Id.* p. 32).

The State objected to the report's conclusion that an evidentiary hearing was warranted. (Doc. 38). It first argued that under *Moore v. Quarterman*, 491 F.3d 213 (5th Cir. 2007), Brumfield's newly-presented evidence of mental retardation "fundamentally altered" his *Atkins* claim, rendering it unexhausted.[5] The State also argued that since Brumfield failed to make a reasonable showing of mental retardation to the state habeas court, it correctly found he failed to present a *prima facie* case as required by Louisiana law, which is entitled to a presumption of correctness.[6] The Court held oral argument on the matter, agreed with the magistrate judge (Minute Entry for June 30, 2008, Doc. 42), and issued a ruling adopting the report as its decision (Doc. 43).

### B. Legal Prerequisites to a Federal Habeas Hearing

Federal habeas law precludes federal courts from re-adjudicating a claim that was adjudicated on the merits in state court unless the state court decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

---

[5] Unexhausted claims, like procedurally defaulted claims, may nonetheless be excused and thus properly raised in a federal habeas petition if the petitioner "can demonstrate cause … and actual prejudice." *Moore*, 491 F.3d at 220 (quoting *Martinez v. Johnson*, 255 F.3d 229, 239 (5th Cir. 2001)).

[6] Crucially, the State did not attempt to justify the state habeas court's failure to consider Brumfield's funding requests, nor did it attempt to show that Brumfield did not meet the cause and prejudice test. (*See* Objection to Report, Doc. 38). As the standard notice attached to the report and received by the State notes, "[t]he failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation … shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court." (Magistrate Judge's Report, Doc. 37, p. 1 (citing 28 U.S.C. § 636(b)(1))). The parties therefore agree that, for purposes of 28 U.S.C. § 2254(e)(2), Brumfield has satisfied that test, and the Court agrees.

Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Even a state court adjudication found incorrect under federal standards does not necessarily suffice in meeting this statutory standard; the state court action must also be objectively unreasonable such that fair-minded jurists would agree on the impropriety of the state court decision. *Harrington v. Richter*, -- U.S. --, 131 S.Ct. 770, 785-86 (2011). In all inquiries under § 2254(d), federal review is confined to the record before the state court. *Cullen v. Pinholster*, -- U.S. --, 131 S.Ct. 1388, 1398 (2011); *Richter*, 131 S.Ct. at 785.

State court factual determinations are presumed correct unless a petitioner overcomes that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The interplay between § 2254(d)(2) and (e)(1) has been the subject of much spilled ink, but the Supreme Court has not definitely decided the issue.[7] It has, however, made clear that the two inquiries do not merge. *Miller-El v. Cockrell*, 537 U.S. 322 (2003).

A habeas applicant who "failed to develop the factual basis of a claim in State court" may nevertheless obtain an evidentiary hearing on the claim if "a factual predicate [] could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(ii). This factual proffer, as a pre-requisite to a hearing, must "be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B); *see also Michael*[8] *Williams v. Taylor*, 529 U.S. 420, 432 (2000) ("Under … §

---

[7] *See Valdez v. Cockrell*, 274 F.3d 941, 951, n. 17 (5th Cir. 2001) (holding that § 2254(e)(1)'s presumption of correctness applies to particular factual findings which a petitioner must overcome by clear and convincing evidence as to that particular factual finding but that the standard in § 2254(d)(2) applies to the overall state court decision in light of the facts it finds).

[8] The Court cites the petitioner's first name from that case for two reasons: (1) to distinguish the case from *Terry Williams v. Taylor*, 529 U.S. 362 (2000), another U.S. Supreme Court case decided the same term; and (2) to

2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."). Thus, the "cause and prejudice" inquiry of § 2254(e)(2) only attaches to claims that have been procedurally defaulted, not claims decided on the merits. *Michael Williams*, 529 U.S. at 434 (rejecting a reading of § 2254(e)(2) that would encompass diligently-pursued claims that remained factually undeveloped due to the fault of another party or the court). The fundamental "distinction between a prisoner who is at fault and one who is not," *id.* at 435, is the line which determines whether a "cause and prejudice" inquiry is necessary under § 2254(e)(2), and diligence marks the touchstone for determining whether an undeveloped factual record stands attributable to the prisoner's "failure" to pursue it, *id.* at 434 ("[T]he opening clause of § 2254(e)(2) codifies [the previously recognized] threshold standard of diligence….").

Traditional analysis in the Fifth Circuit found that a person who neither had their claims decided on the merits nor who procedurally defaulted through their own lack of diligence needed only to satisfy Rule 8 of the Federal Rules Governing Section 2254 Cases, *see, e.g., Guidry v. Dretke*, 397 F.3d 306, 323 (5th Cir. 2005), and pre-AEDPA case law, *see, e.g., Townsend v. Sain*, 372 U.S. 293 (1963), to receive a federal hearing. However, the *Guidry* decision has been abrogated by the Supreme Court's recent clarification of the interplay of §§ 2254(d) and 2254(e)(2) in *Pinholster* as recognized in *McCamey v. Epps*, 658 F.3d 491, 497, n. 1 (5th Cir. 2011). The precise contours of when an evidentiary hearing may be granted have become less clear, but the general trend has diminished the vitality of the pre-AEDPA *Townsend* factors and emphasized the rarity in which federal hearings should occur. *See, e.g., McCamey*, 658 F.3d 491.

---

distinguish the case from the other two *Williams* cases cited in this opinion that come from the Louisiana Supreme Court: *State v. Corey Williams*, 831 So.2d 835 (La. 2002) and *State v. Shedran Williams*, 22 So.3d 867 (La. 2009).

While *Michael Williams* has not been overruled, its explicit holding that § 2254(e)(2) only applies to petitioners who did not diligently attempt to factually develop their claims in state court must be evaluated in light of *Pinholster*'s murky statements regarding the interaction of § 2254(d) and § 2254(e)(2). Textually, the provisions seem to apply only in mutually exclusive situations, as *Michael Williams* pointed out, but lately the Supreme Court seems to have implied that the "cause and prejudice" standard codified in § 2254(e)(2) nonetheless may apply even to claims that have already met one of the § 2254(d) standards. *See Pinholster*, 131 S.Ct. at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief.… At a minimum, therefore, § 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court." (citation omitted)); *id.* at 1412 (Breyer, J., concurring in part and dissenting in part) ("[Section] 2254(d)(1) does not leave AEDPA's hearing section, § 2254(e), without work to do…. If the federal habeas court finds that the state-court decision fails (d)'s test (or if (d) does not apply), then an (e) hearing may be needed."). *See also Schriro v. Landrigan*, 550 U.S. 465, 468 (2007) ("In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court.") *and Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2005) (holding that cases which do not present procedural defaults do not fall under § 2254(e)(2) and thus the propriety of granting a federal hearing is governed by pre-AEDPA jurisprudence). While *Michael Williams* is still good law and thus it appears that §§ 2254(d) and (e)(2) govern different situations, even in *Pinholster*'s wake, a federal hearing may in any event be granted under § 2254(e) when the traditional "cause and prejudice" factors have been met.[9]

---

[9] To reiterate, the State did not object to the magistrate judge's findings and conclusion regarding Brumfield's satisfaction of the cause and prejudice test under § 2254(e)(2), making re-analysis of that issue unnecessary.

Either way, the first level of inquiry requires a determination of whether the state court's disposition of Brumfield's *Atkins* claim rested on a state procedural ground—which would then trigger the "cause and prejudice" inquiry of § 2254(e)(2) that the State does not contest Brumfield satisfies—or was made on the merits, which would present a straightforward assessment under § 2254(d).

The totality of the state habeas court's analysis of Brumfield's *Atkins* claim is as follows:

> [T]here are several issues we need to take up. I guess the biggest one we need to address is the claims of mental retardation and *Atkins* and whether or not the defendant is entitled to a hearing to determine that issue, and I've read the cases that were cited and also both sides' arguments, and even in *Atkins* it is clear that everybody that's facing the death penalty is not entitled to an *Atkins* hearing.
>
> The cases say that that's to be taken up on a case-by-case method, and the burden of proving that that is an issue that needs to be addressed is on the defendant here. I've looked at the application, the response, the record, portions of the transcript on that issue, and the evidence presented, including Dr. Bolter's testimony, Dr. Guinn's testimony, which refers to and discusses Dr. Jordan's report, and based on those, since this issue – there was a lot of testimony by all of those in Dr. Jordan's report. Dr. Bolter in particular found he had an IQ of over – or 75. Dr. Jordan actually came up with a little bit higher IQ. I do not think that the defendant has demonstrated impairment based on the record in adaptive skills. The doctor testified that he did have an anti-social personality or sociopath, and explained it as someone with no conscience, and the defendant hasn't carried his burden placing the claim of mental retardation at issue. Therefore, I find he is not entitled to that hearing based on all of those things that I just set out.

Transcript of Post-Conviction Hearing of Oct. 23, 2003, Vol. PC, pp. 3-4.

In the absence of any cited procedural grounds, the Supreme Court has directed federal habeas courts to presume the issue was resolved on the merits. *Richter*, 131 S.Ct. at 784-85. Clearly, there is no reason to conclude this was merely a procedural default. The state habeas judge's discussion hinges on Brumfield's lack of evidence to establish a *prima facie* case of mental retardation on the adaptive skills prong of the test defined in Louisiana law. The denial

of the *Atkins* hearing by the state post-conviction court was a determination on the merits which is reviewed under § 2254(d).

    C.  <u>The State Court Made a Merits Decision on Brumfield's Atkins Claim by Unreasonably Applying Clearly Established Supreme Court Precedent, Thereby Violating Section 2254(d)(1).</u>

Normally, federal habeas courts owe substantial deference under AEDPA to state court factual findings. 28 U.S.C. § 2254(e)(1). However, when a state court unreasonably applies federal law as an antecedent to a factual determination of a defendant's claim, no AEDPA deference is due the state court's factual determination. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (holding that a state court's failure to hold an evidentiary hearing when presented with a substantial showing of incompetency deprived defendant of due process and thus unreasonably applied clearly established federal law). In this case, the state habeas judge's refusal to grant an evidentiary hearing based on Brumfield's failure to present a *prima facie* claim of mental retardation (which on the whole may be a mixed question of fact and law but, for purposes of this case, will be presumed a purely factual inquiry) rested on an unreasonable application of clearly established Supreme Court law, which deprives the state habeas court's determination of AEDPA deference. *See Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010).

In *Wiley*, the Fifth Circuit found that when a petitioner presents a *prima facie* case of mental retardation but is nevertheless denied a state court hearing on the issue, the state court's determination of the mental retardation issue does not deserve deference under the AEDPA. 625 F.3d at 207. The Fifth Circuit noted that *Atkins* "was decided against the backdrop of the Supreme Court's and lower court's due process jurisprudence." *Id.* (quoting *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007)). This jurisprudence included *Ford v. Wainwright*, 477 U.S. 399 (1986), which required a hearing in accord with fundamental fairness

and procedural due process for defendants making a showing of insanity.  *Id.*  *Rivera* held that a *prima facie* showing of mental retardation in state court requires it to provide a full and fair evidentiary hearing.  505 F.3d at 357-58.  Using these teachings, *Wiley* set out a framework for analysis:  a federal habeas court must decide if a *prima facie* case of mental retardation under state law (pursuant to *Atkins*) was presented to the state court, which triggers the requirement for a full evidentiary hearing.  625 F.3d at 207.  If the petitioner did so but did not receive a hearing, the state court acted unreasonably in light of clearly established federal law and consequently loses AEDPA deference.  *Id.* at 207-08.

Brumfield presents an even stronger case for denying AEDPA deference than was found in *Rivera* or *Wiley*.  Here, the state court denied Brumfield even the *opportunity* to develop his *prima facie* case.  The state habeas court ignored at least four clear pleas for funding to retain experts to evaluate Brumfield and develop his then-pending claims.  If *Rivera*, *Panetti*, and *Wiley* deny AEDPA deference based on the state court erroneously failing to grant a hearing to assess a properly made *prima facie* case, then *a fortiori* a petitioner who is denied even the chance to make such a case deserves the same treatment.  Accordingly, the state court violated Brumfield's due process guarantees when it failed to allow him adequate funding to retain experts to address his claim.  *Cf. Coleman v. Zant*, 708 F.2d 541, 548 (11th Cir. 1983) (holding that when a state court denies an indigent petitioner with the funds necessary to develop adequate evidence to support a habeas claim, that denial fails to accord a "full and fair" hearing under *Townsend v. Sain*).[10]  This denial came in the face of clearly established federal law as determined by the

---

[10] A full and fair hearing is no longer necessarily a prerequisite for AEDPA deference, *see Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001), but that is because a full and fair hearing on a post-conviction claim no longer serves as a requirement of due process or § 2254, *see, e.g., Richter*, 131 S.Ct. at 784, *not* because due process is wholly inapplicable in the post-conviction setting.  When due process has been violated by a state court, AEDPA simply does not require deference be given to subsequent state court determinations related to that violation.  *Panetti*, 551 U.S. at 953.

Supreme Court circa October 23, 2003, the date the state habeas court denied Brumfield's *Atkins* claim and, in so doing, essentially ignored and mooted his pending requests for expert funding. Specifically, both *Atkins* and *Ford* had been decided and clearly established before that date.

This jurisprudential backdrop should not have been ignored by the state habeas court, and failure to grant the expert funding (or allow counsel time to obtain such funding from another source) constituted not just a violation of general federal due process law, but also a stark departure from clearly established state law as determined by the Louisiana Supreme Court. As noted above, the Louisiana Supreme Court in *State ex rel. Williams v. State*, 888 So.2d 792 (La. 2004), eventually recognized the frustrating situation petitioners such as Brumfield found themselves in when represented by *pro bono* counsel. The Louisiana Indigent Defense Assistance Board (LIDAB) has been delegated statutory authority to provide Louisiana state habeas petitioners with counsel, and they contracted with the Capital Post-Conviction Project of Louisiana (CPCPL) to provide such services. LIDAB had a rule prohibiting *pro bono* counsel handling capital post-conviction cases from getting funds for expert witnesses from LIDAB, which drew the interest of the Court. 888 So.2d at 797. LIDAB immediately changed its rule and permitted *pro bono* counsel to acquire funds to retain expert assistance in capital post-conviction cases. While the state habeas court did not have the benefit of that guidance, there existed a litany of Louisiana Supreme Court cases addressing the necessity of giving post-conviction petitioners time and funding to develop claims. *See, e.g., State ex rel. Cage v. Butler*, 593 So.2d 375 (La. 1992); *State ex rel. Deboue v. Whitley*, 592 So.2d 1287 (La. 1992); *State v. Brown*, 566 So.2d 967 (La. 1990). These Louisiana cases do not establish a § 2254(d)(1) violation, of course, but they do illustrate the gravity of the due process violation.

This Court remains keenly aware of *Atkins*' admonition that "[n]ot all people who claim to be mentally retarded will be so impaired," 536 U.S. at 317, as to fall within the class of persons for whom a hearing must be held. Clearly, because the Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction," *id.*, it also left to the States the ability to perform a meaningful screening of such claims. Having a *prima facie* prerequisite to obtaining a full hearing makes eminent sense, lest every death row inmate bring an *Atkins* claim simply to delay their execution. *See Corey Williams*, 831 So.2d at 858, n. 33 ("There is no automatic right to a hearing on the issue of mental retardation….").

Likewise, requiring some rudimentary, preliminary showing of a colorable mental retardation claim in order to obtain expert funds to more fully explore the issue also seems reasonable. *Cf id.* (holding that the "reasonable grounds" test to show a *prima facie* case and trigger an *Atkins* evidentiary hearing requires a defendant to come forward "with some evidence to put his mental condition at issue"); *see also State v. Campbell*, 983 So.2d 810, 826, n. 9 (La. 2008) (refusing to allow hearing on mental retardation issue despite an IQ test of 67 because "the defendant refused point-black to participate in evaluations [by State experts] designed to determine whether he is mentally retarded").

But as this case illustrates, wholly ignoring clear requests for funding to retain experts— based presumably, though the Court cannot know because the state court never supplied a reason, on the same reasons why the state court denied the claim in its entirety—shows this silent denial to be a particularly cruel and unreasonable catch-22: without expert funding, no *prima facie* showing is likely possible, yet without a *prima facie* showing, no expert funding is forthcoming. The state habeas court's imposition of this catch-22 finds no support in any

precedent and sharply diverges from clearly established rules for the provision of due process of law.

Thus, this Court is convinced that the denial of Brumfield's *Atkins* claim in the state habeas court, coupled with its silent denial of his request for funding to retain experts to factually develop his claim, was based on the state habeas court's unreasonable application of clearly established federal due process law as determined by the Supreme Court in *Atkins* and *Ford v. Wainwright* (and later confirmed by *Panetti*) at the time the state habeas court rendered its decision, in violation of § 2254(d)(1). Its decision was not only incorrect, but unreasonable, meaning that fair-minded jurists would agree the state court's determination was incorrect. *Richter*, 131 S.Ct. at 785-86.

Moreover, in this instance, the due process rules that were clearly established, both then and now, were not broad.[11] The due process rules violated here were tailored to address specific situations in which habeas petitioners proffered, or claimed an ability to proffer once given the opportunity, substantial showings of ineligibility for the death penalty based on clearly delineated requirements for *prima facie* showings. The state habeas court's two-fold denial on the merits of Brumfield's *Atkins* claim and silent denial of his request for funding to develop that claim represented an unreasonable application of then-existing due process law as determined by the Supreme Court, which thus deprives that decision of AEDPA deference. This Court was convinced at that point that petitioner's *Atkins* claim showed a reasonable likelihood of success, permitting an adjudication of Brumfield's *Atkins* claim on the merits by virtue of § 2254(d)(1).

D. The State Court Made a Merits Decision on Brumfield's Atkins Claim That Was an Unreasonable Determination of the Facts in Light of the Evidence Presented to the State Court, Thereby Violating Section 2254(d)(2).

---

[11] The amount of latitude state courts have corresponds with the specificity of the rule: "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

For similar reasons, the state habeas court's decision on the merits of Brumfield's *Atkins* claim suffered from an unreasonable determination of the facts in light of the evidence presented in the state habeas proceedings in violation of § 2254(d)(2). Review is limited to the record before the state court. *Richter*, 131 S.Ct. at 785. Federal courts must give deference to state court determinations of historical fact under § 2254(e)(1).[12] *Valdez v. Cockrell*, 274 F.3d 941, 948, n. 12 (5th Cir. 2001) (noting that conclusions of law and mixed questions of law and fact are examined under § 2254(d)(1)). When evaluating the different prongs of a mental retardation inquiry, it appears that state court determinations of each prong are considered historical fact determinations that are reviewed for clear error and thus receive the full benefit of § 2254(e)(1). *See, e.g., Williams v. Quarterman*, 293 Fed.Appx. 298, 308 (5th Cir. 2008) (construing a Texas state court's evaluation of the mental retardation prongs under the *Briseno* decision to be purely factual determinations reviewable for clear error); *Rivera v. Quarterman*, 505 F.3d 349, 361 (5th Cir. 2007) (same). Because the state habeas court in this instance clearly pinned its decision on the adaptive skills prong, Brumfield must show by clear and convincing evidence that this determination was wrong.

At least one circuit court has explicitly held that a state habeas court is objectively unreasonable under § 2254(d) when dispositively crediting evidence of mental retardation, received only as a mitigating factor during sentencing in the pre-*Atkins* era, when resolving a full *Atkins* claim in a state habeas court without benefit of a full evidentiary hearing. *Allen v. Buss*, 558 F.3d 657, 661-65 (7th Cir. 2009) (citing *Hall v. Quarterman*, 534 F.3d 365, 371-72 (5th Cir. 2008)).

---

[12] In pertinent part, the statute informs federal courts that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The Fifth Circuit in *Hall v. Quarterman* further noted that paper hearings may deprive a petitioner of a full and fair hearing, mentioning that they are particularly inappropriate when the state habeas judge faces a different constitutional standard than the sentencing judge did. 534 F.3d at 371-72. Similarly, *Perillo v. Johnson*, 79 F.3d 441, 446-47 (5th Cir. 1996) discussed the adequacy of paper hearings in satisfying the pre-AEDPA constitutional standard for a "full and fair hearing," the existence of which determines whether the state court's determination receives the presumption of correctness in the first place. *But see Valdez v. Cockrell*, 274 F.3d 941, 949-51 (5th Cir. 2001) (holding that a full and fair hearing is not a precondition to giving state courts AEDPA deference). Regardless of *Perillo*'s current standing in light of AEDPA, it appears the law still treats the sufficiency of paper hearings on a case-by-case basis. One important benchmark is whether the state habeas judge is the same judge who presided over the petitioner's trial. *Perillo*, 79 F.3d at 446. *See also Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000) (discussing how summary denial by a state court may entitle a petitioner to an evidentiary hearing in federal court).

In this case, the state habeas judge, Judge Anderson, did not conduct Brumfield's capital trial in state district court, which was handled by the late Ralph Tyson—a beloved, recently-departed colleague on this Court. Under *Hall* and *Perillo*, because the state habeas judge was both a different person than the state trial judge and had to apply a new constitutional standard which was not previously available at trial, no presumption of sufficiency attaches to the paper hearing. Of course, while a change in judicial identity does not on its own alter the reasonability analysis or diminish the presumption of correctness accorded the factual findings, it nonetheless does inform the Court's view of the state habeas court's actions. The Supreme Court's decision

in *Richter* is not to the contrary insofar as it does not discuss whether summary dispositions must be viewed through the same lens based on the identity of the state trial and habeas judges.

As the state habeas court itself explained, its review of the *Atkins* claim was limited to the record developed in the sentencing phase of Brumfield's trial, which included the following specific pieces of evidence: the testimony of Dr. John Bolter, the testimony of Dr. Cecile Guin, and a report issued by a Dr. Jordan.[13] Reliance on these pieces of evidence alone, regardless of their intrinsic value, renders the state habeas court decision dubious in and of itself, for several reasons. And when the evidence is actually examined, it is clear that the state habeas court transgressed the bounds of reasonableness in denying Brumfield an evidentiary hearing.

First, the state sentencing took place in 1995, several years before the *Atkins* decision in 2002. During the sentencing phase, neither defense counsel nor the trial court had the benefit of the *Atkins* decision, which may have altered the strategic choices of the defense in deciding not to present mitigating evidence that Brumfield was mentally retarded. *See Atkins*, 536 U.S. at 320 (holding that as a mitigating factor, mental retardation often serves as a "two-edged sword that may enhance the likelihood" of wrongful execution because jurors may be more inclined to find that individual dangerous); *State v. Corey Williams*, 831 So.2d 835, 856, n. 31 (La. 2002)[14] (pointing out why counsel may avoid introducing mental retardation as a mitigating factor); *see also id.* at 856-57 ("[M]ost significantly, *Atkins* changed what would be considered relevant.

---

[13] As counsel have advised the Court, Dr. Jordan's report was never submitted into evidence at any stage of the state court proceedings—both at trial and post-conviction—but it was discussed in Dr. Bolter's submitted expert report (State Trial Record, Vol. II, pp. 267-276) and in the live testimony of both Dr. Bolter and Dr. Guin (State Sentencing Record, Vol. XVI, pp. 3857-3910). The Jordan report was submitted to this Court during its evidentiary hearing, but its content is irrelevant in determining the propriety of the state court action under *Pinholster* since it was not in the state court evidentiary record.

[14] *Corey Williams* and *State v. Dunn*, 831 So.2d 862 (La. 2002) ("*Dunn I*") were issued on the same day and dealt with much the same issues, namely, establishing an interim set of procedures for courts to follow in *Atkins* situations until the Louisiana legislature spoke on the issue. While La. C.Cr.P. art. 905.5.1 certainly superseded the inconsistent portions of *Corey Williams* and *Dunn*, as recognized in *State v. Turner*, 936 So.2d 89, 95 (La. 2006), those decisions retain vitality and have provided guidance in determining questions the statute does not answer. *State v. Dunn*, 974 So.2d 658, 661-62 (La. 2008) ("*Dunn III*") (recognizing the limited scope of art. 905.5.1 and applying *Corey Williams* to cases in a post-verdict posture).

Prior to the trial, mental retardation was merely a factor in mitigation. Post *Atkins*, mental retardation is a complete prohibition against imposition of the death penalty according to the United States Supreme Court."). At least one member of the Fifth Circuit has concluded that, based upon this language, Louisiana courts cannot rely upon mental retardation evidence presented for mitigation as evidence of *Atkins* mental retardation. *Hall*, 534 F.3d at 392 (Higginbotham, J., concurring in part and dissenting in part) (citing *Corey Williams*, 831 So.2d at 856-57). While that conclusion may not be treated as a *per se* rule in the Louisiana courts on direct review, *see State v. Manning*, 885 So.2d 1044 (La. 2004) (declining on direct review to remand for *Atkins* hearing based on State's evidence introduced during pre-*Atkins* sentencing), this case comes before the Court on federal collateral review following state collateral review. And as the cases discussed below will demonstrate, *Manning* at the very least is limited to factual scenarios where the mental retardation issue was actually presented to a jury, even if as mitigating evidence instead of *Atkins* evidence, because Louisiana courts do not tolerate mere mitigation evidence presented on another issue to be used to decide an *Atkins* issue.

Second, the state habeas court had adequate notice that its determination was factually unreasonable in light of the multiple funding requests for the development of expert testimony on Brumfield's habeas claims. The inexplicable decision to ignore these requests—either because the state habeas judge thought them meritless or unimportant or simply failed to realize they had been made, this Court can only guess—on its face makes the denial of Brumfield's *Atkins* claim unreasonable. The record before the state court on October 23, 2003 demonstrates that Brumfield had not made out a *prima facie* case of mental retardation, (*see* Magistrate Judge's Report, Doc. 37), but that in itself is both unremarkable and predictable. Finding that Brumfield failed to establish his *prima facie* case was not the unreasonable factual determination; rather, it

was the state court's failure to realize Brumfield had no chance to do so, based on its denial of funds, that comprises the unreasonable determination here.

Third, the state habeas judge hinged his conclusion that Brumfield was not entitled to a hearing on the adaptive skills prong of the mental retardation test that Louisiana law spells out. Not only is this the murkiest and most subjective part of the mental retardation test, as will be made clear below in Part III, but it requires exhaustive factual specificity since so many factors[15] can influence "adaptive behavior as expressed in conceptual, social, and practical adaptive skills." La. C.Cr.P. art. 905.5.1(H)(1). As mentioned above, reliance on record evidence from a pre-*Atkins* sentencing already makes this determination somewhat dubious. When a Louisiana state court relies on record evidence from a pre-*Atkins* sentencing that, *on its own terms, does not even relate to mental retardation*, it cannot be deemed to have made a reasonable factual determination as a matter of law.

The case coming closest to validating the State's position, *State v. Manning*, 885 So.2d 1044 (La. 2004), simply does not stand for the blanket proposition that "where the record provides sufficient evidence negating a contention that a defendant is mentally retarded, an evidentiary hearing is unnecessary to further litigate [sic] is already established." (State's Objection to Magistrate Judge's Report, Doc. 38, p. 6). In *Manning*, the Louisiana Supreme Court affirmed on direct review a murder conviction and capital sentence. 885 So.2d at 1057. In the *Manning* Court's discussion of the defendant's *Atkins* claim, 885 So.2d at 1106-07, the Court simply notes that conflicting testimony was presented at sentencing, with one expert opining that defendant was "mildly retarded or at least slow learner level" and another stating that "he

---

[15] The AAIDD 9th Edition mentions no less than ten factors, and a petitioner must show significant limitation in two of them to qualify as mentally retarded. The AAIDD 10th Edition groups those factors into conceptual, social, and practical domains and requires a petitioner to show significant limitation in one of the overall domains to qualify as mentally retarded.

functioned in the 'just below average' range." *Id.* at 1107. In reviewing the defendant's conduct during the investigation, the Court found on the record before it that he failed to demonstrate a reasonable likelihood of mental retardation. *Id.* *Manning* thus dealt with a situation where, at the very least, evidence of mental retardation was squarely put before the state trial court at sentencing. While the State correctly points out that the defendant in *Manning* had been sentenced prior to *Atkins*, it fails to note the crucial difference: the *Manning* defendant actually presented evidence of mental retardation to the jury, whereas here Brumfield did not. Moreover, *Manning* came to the Louisiana Supreme Court by way of direct review, which necessarily limited its scope to matters directly litigated, whereas post-conviction review is the proper forum for raising a broader array of claims, including mental retardation issues not submitted to the jury at trial. *Cf. State v. Holmes*, 5 So.3d 42, 99 (La. 2008) (Calogero, C.J., dissenting) (arguing that an adequately developed record regarding mental retardation, even if not submitted to the jury under La. C.Cr.P. art. 905.5.1, should be reviewable on direct appeal instead of relegating that determination to a post-conviction proceeding, the course the *Holmes* majority required the defendant to pursue).

Fourth, even assuming for the sake of argument that it was not clear legal error to extrapolate *Atkins* evidence on mental retardation from pre-*Atkins* mitigating evidence on competency (the impropriety of which is shown below), the actual evidence elucidated at the sentencing hearing simply does not dovetail with the factors Louisiana courts use to assess mental retardation. The Louisiana legislature enacted La. C.Cr.P. art. 905.5.1 during the 2003 regular session as Act No. 698 (House Bill No. 1017), which it approved on June 27, 2003. Because no effective date was provided in that Act, the Court assumes its provisions were effective immediately. *See Central Freight Lines, Inc. v. United States*, 669 F.2d 1063, 1069

(5th Cir. 1982) ("As a general rule, a new statute should apply to cases pending on the date of its enactment … unless manifest injustice would result, or there is a statutory directive or legislative history to the contrary." (quotation marks and citations omitted)).  Since La. C.Cr.P. art. 905.5.1(H)(1) simply defines adaptive behavior as "expressed in conceptual, social, and practical adaptive skills," Louisiana courts have looked to the AAIDD's clinical definitions for guidance in determining which skills are relevant.  *See Corey Williams*, 831 So.2d 835, 852-54 (noting the U.S. Supreme Court adopted the AAMR's (now the AAIDD's) clinical definition and finding Louisiana's then-existing statutory definition comported with the consensus definition of mental retardation exhibited in the AAMR's definition).  A review of the sentencing phase transcript from Brumfield's trial shows that several factors relevant to the adaptive skills prong—including but not limited to (1) his ability to sustain interpersonal relationships, (2) his ability to maintain self-esteem, (3) whether he is gullible or naïve, and (4) whether he has any practical skills—are simply lacking in discussion or even mention.  (Transcript of Sentencing Phase, Vol. XVI, pp. 3857-3910).  Based on what testimony the state trial court actually heard, it was unreasonable and unfair for the state habeas judge to conclude Brumfield lacked deficits in adaptive skills when entire areas of adaptive skills were not discussed.

Finally, and fatally for the state habeas court's determination, the Louisiana Supreme Court has conclusively determined the impropriety of collapsing a competency inquiry with a mental retardation inquiry.  In *State v. Holmes*, 5 So.3d 42, 58 (La. 2008), the Court stated:

> *Equating competency*, which addresses a defendant's ability to understand the proceedings and to assist in her own defense, see La.Code Crim. Proc. art. 641, *with mental retardation*, which acts as a mitigating circumstance exempting a defendant from the death penalty, constitutes an hyperbole and *does not accord with this state's well-accepted jurisprudence*.  (emphasis added).

The *Holmes* Court went on to cite several cases from the late 1970s and early 1980s to support its conclusion, thus showing that that jurisprudence had sufficiently developed by the time the state habeas judge made his decision. *Holmes* repeats the same admonition the Louisiana Supreme Court has previously given on conflating the two separate inquiries. *See State v. Turner*, 936 So.2d 89, 96 (La. 2006) ("*[E]quating competency* to stand trial *with mental retardation* as an absolute bar to subjection to the death penalty *is a stretch at best*.") (emphasis added). These holdings irrefutably establish the error of the state habeas court and therefore prove, at the very least, that using pre-*Atkins* sentencing evidence related to competency cannot be permitted when deciding an *Atkins* issue. Thus, because the state habeas court reached the merits of Brumfield's *Atkins* claim by relying exclusively on testimony and neuropsychological reports on the issue of competency while knowing Brumfield never had an opportunity to gain funding to hire experts to help support his claim of mental retardation, Brumfield has furnished clear and convincing evidence the state habeas court made an unreasonable determination of the facts in light of the record evidence (or lack thereof) before it in violation of § 2254(d)(2).

As the preceding discussion illustrates, the issues of factual unreasonableness under § 2254(d)(2) and legal unreasonableness as measured by then-existing Supreme Court law under § 2254(d)(1) inextricably intertwine in this case. Whichever way the state court's determination is sliced, though, the result the law compels this Court to reach remains the same. If the Court's inquiry looks only at the facts in evidence which the state habeas court reviewed, a common sense appraisal of that evidence convincingly shows that the standards relevant to a competency inquiry simply do not equate with the standards relevant to a mental retardation inquiry. That alone makes it a convincing case for an unreasonable factual determination, a conclusion simply bolstered by reviewing Louisiana law, *see State v. Holmes*, 5 So.3d at 58, and federal law, *see,*

*e.g., Atkins*, 536 U.S. at 320-21; *Allen v. Buss*, 558 F.3d 657, 661-65 (7th Cir. 2009); *Hall v. Quarterman*, 534 F.3d 365, 371-72 (5th Cir. 2008). The facial unreasonableness of the state court's factual determination under § 2254(d)(2)—non-retardation based on the ill-suited proxy of competency—is further compounded when taking into account the repeated requests Brumfield lodged with the state court seeking funding for expert evaluation. On the other hand, when looking only at the legal standards used and/or complied with by the state court, it is clear that due process was denied Brumfield. Whether viewed as an action which (1) simply ignored *Atkins*'s admonition not to use mitigating evidence as determinative (made even more egregious because the mitigating evidence related to competency, not mental retardation), or (2) failed to follow due process law as established by *Ford v. Wainwright* to grant an evidentiary hearing when a *prima facie* case was presented it (and thus eviscerated due process by preventing Brumfield the opportunity to develop such a *prima facie* case), the state court unreasonably applied those established Supreme Court standards and violated § 2254(d)(1).

The State therefore cannot show that newly-decided cases which constitute binding precedent on this Court make its previous determination to hold an evidentiary hearing improper. Its converted motion for reconsideration is therefore DENIED, and the Court reaffirms its finding that the evidentiary hearing was properly held as detailed in magistrate judge's report and recommendation and supplemented by this ruling.

## III.

Having rejected the State's converted motion to reconsider the propriety of the evidentiary hearing the Court already conducted, the Court now deals with the merits of Brumfield's *Atkins* claim.

A. <u>Louisiana Law Has Adopted the Definition of Mental Retardation Contained in the AAIDD's 10th Edition.</u>

In *Atkins v. Virginia*, the United States Supreme Court concluded that capital punishment of a mentally retarded person violates the Eight Amendment's prohibition against cruel and unusual punishment. 536 U.S. 304, 321 (2002). However, the *Atkins* Court left to the States the task of defining mental retardation. *Id.* at 317. The Court did discuss with approval the clinical standards used by the American Association on Mental Retardation (AAMR, hereinafter "AAIDD")[16] and the American Psychiatric Association (APA). *Id.* at 308-09, n. 3. Because there appears to be a dearth of Fifth Circuit cases which apply Louisiana law[17] to an *Atkins* claim, the Court pauses to detail Louisiana statutory and case law, which provide an explanation of the legal framework Louisiana has elected to use pursuant to the *Atkins* mandate.

In confirming its compliance with the *Atkins* decision, the legislature ensured that, "[n]otwithstanding any other provisions of law to the contrary, no person who is mentally retarded shall be subjected to a sentence of death." La. C.Cr.P. art. 905.5.1(A). Article 905.5.1(H) of the Louisiana Code of Criminal Procedure provides the operative definition the Court must apply:

> (1) "Mental retardation" means a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.

> (2) A diagnosis of one or more of the following conditions does not necessarily constitute mental retardation:

> > (a) Autism.

---

[16] *Atkins* cited the AAMR's clinical standard as set forth in <u>Mental Retardation: Definition, Classification, and Systems of Support</u> (9th ed. 1992). The AAMR later changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD). They have also subsequently updated their text in a 10th Edition, published in 2002, and now an 11th Edition, re-titled as <u>Intellectual Disability: Definition, Classification, and Systems of Support</u>, published in 2010. The 11th Edition makes largely cosmetic changes in terminology, as the change in title reflects.

[17] The Fifth Circuit has decided a litany of cases expounding upon the *Atkins* standard in light of Texas law, *e.g.*, *Hall v. Quarterman*, 534 F.3d 365 (5th Cir. 2008); *Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007), and at least one in light of Mississippi law, *Wiley v. Epps*, 625 F.3d 199 (5th Cir. 2010). However, this Court is not aware of any Fifth Circuit decision construing Louisiana law on mental retardation.

(b) Behavioral disorders.
(c) Cerebral palsy and other motor deficits.
(d) Difficulty in adjusting to school.
(e) Emotional disturbance.
(f) Emotional stress in home or school.
(g) Environmental, cultural, or economic disadvantage.
(h) Epilepsy and other seizure disorders.
(i) Lack of educational opportunities.
(j) Learning disabilities.
(k) Mental illness.
(l) Neurological disorders.
(m) Organic brain damage occurring after age eighteen.
(n) Other handicapping conditions.
(o) Personality disorders.
(p) Sensory impairments.
(q) Speech and language disorders.
(r) A temporary crisis situation.
(s) Traumatic brain damage occurring after age eighteen.

La. C.Cr.P. art. 905.5.1(H). Brumfield bears the burden of proving by a preponderance of the evidence that he meets the statutory definition. *Id.*, art. 905.5.1(C)(1).

Louisiana law tracks the clinical definition provided by the AAIDD in <u>Mental Retardation: Definition, Classification, and Systems of Support</u> (10th ed. 2002) (hereinafter, "10th Edition").[18] The 10th Edition provides:

> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

(10th Edition, Petitioner's Ex. 11, at p. 1). But the AAIDD also presents five assumptions that guide application of the clinical definition. Crucially, it notes that individual "limitations often coexist with strengths" and counsels that with appropriate supports, a mentally retarded person's functioning can generally improve. (*Id.*).

---

[18] The 10th Edition was introduced into evidence as Petitioner's Ex. 11 (hereinafter cited as "Ex. P-11"). The User's Guide to the 10th Edition, an important supplemental aid, was introduced into evidence as Petitioner's Ex. 13. The 11th Edition was introduced into evidence as Petitioner's Ex. 12.

The 10th Edition, published in 2002, contains the current, consensus definition of mental retardation, which the Louisiana legislature adopted. (*See* Swanson Testimony, Doc. 106, p. 26 (detailing the drafting history of La. C.Cr.P. art. 905.5.1)). Therefore, reference by the Court to the AAIDD's definition is an appropriate means of discerning what personal characteristics are involved in assessing petitioner's "intellectual functioning and … conceptual, social, and practical adaptive skills" as defined in art. 905.5.1. The Court finds ample support for adopting the AAIDD's definition in the seminal cases of *Atkins* and *Corey Williams*, and therefore the AAIDD's definition as contained in its 10th Edition will provide the authoritative definition used by this Court in assessing Brumfield.[19] *Cf. Moore v. Quarterman*, 342 Fed.Appx. 65, 74 (5th Cir. 2009) (finding no abuse of discretion under Texas law in strictly applying the AAIDD 10th Edition's clinical definition).

Because the Court receives substantial guidance from the experts involved, a brief introduction to their qualifications and the basis for and summary of their testimony and conclusions is in order. Testifying for Brumfield were Stephen Greenspan, Ph.D., Ricardo Weinstein, Ph.D., Victoria Swanson, Ph.D., and James Merikangas, M.D.[20] Testifying for the State were Robert Blanche, M.D., Donald Hoppe, Psy.D., and John Bolter, Ph.D.

Dr. Greenspan is a licensed psychologist who obtained his Ph.D. in 1976. (Greenspan Curriculum Vitae, Ex. P-1). At the time of the hearing, he served as a visiting professor at the University of Colorado Medical School. (Greenspan Testimony, Doc. 101, p. 5). He is one of the foremost mental retardation experts in the country, and his work is cited in the 10th Edition numerous times. (*Id.*, pp. 10-11). He was accepted by the Court as an expert in mental

---

[19] When ambiguities exist or where other sources might provide useful insight, the Court will look to those sources for guidance, but because the legislature implicitly endorsed the 10th Edition's definition, the Court will consider that source first.
[20] Merikangas submitted an expert report but did not testify at the hearing.

retardation and adaptive behavior. (*Id.*, pp. 24-25). His testimony generally concerned proper use of the AAIDD's clinical standards in making diagnoses of mental retardation. (*See generally* Greenspan Testimony, Doc. 101, pp. 4-218).

Dr. Weinstein is a licensed psychologist who obtained his Ph.D. in 1981. (Weinstein Curriculum Vitae, Doc. 30-1, p. 20). At the time of the hearing, Dr. Weinstein had a forensic practice and also testified as an *Atkins* expert in various courts. (Weinstein Testimony, Doc. 101, pp. 219-230). He was accepted by the Court as an expert in mental retardation and forensic neuropsychology. (*Id.*, p. 234). He made a diagnostic evaluation of Brumfield after: personally meeting with Brumfield on two occasions for 5-6 hours; speaking with him for another 7 hours; reviewing Brumfield's social history; school records; medical records; institutional records; prison records; previous expert reports, evaluations, and depositions; Brumfield's prior statements to police; and interviews with at least 14 individuals. (Weinstein Testimony, Doc. 102, pp. 19-37). He also administered the ABAS-II adaptive behavior scales to several individuals. His testimony concerned his methodology and reasoning for reaching the conclusion that Brumfield is mentally retarded. (*See generally* Weinstein Testimony, Docs. 101, pp. 219-284 *and* 102, pp. 3-176 *and* 103, pp. 3-127; *see also* Weinstein Report, Doc. 30-1, pp. 3-18).

Dr. Swanson is a Louisiana-licensed psychologist who received her Ph.D. from LSU in 1999. (Swanson Curriculum Vitae, Doc. 30-1, pp. 31-39; Swanson Testimony, Doc. 106, p. 19). Before receiving her Ph.D., Swanson worked in the mental retardation field for 26 years in various capacities, including work with school districts, teachers, and appraisal teams. (Swanson Testimony, Doc. 106, pp. 20-22). She served on the committee that drafted the Louisiana bill which eventually became law and created La. C.Cr.P. art. 905.5.1. (*Id.*, pp. 26-27). She was

accepted by the Court as an expert in mental retardation and psychology. (*Id.*, p. 31). She created Brumfield's social history by reviewing school, medical, and institutional records. (*Id.*). She then met with Brumfield for 5 hours and reviewed additional evidence submitted by the State in this litigation, including much of the information Dr. Weinstein reviewed. (*Id.*, pp. 31-46). Her testimony sifted through Brumfield's past, emphasized his social history, and ultimately concluded that he is mentally retarded. (*See generally* Swanson Testimony, Doc. 106, pp. 19-237; *see also* Swanson Report, Doc. 30-1, pp. 25-30).

Dr. Merikangas is a physician who received his M.D. in 1969. (Merikangas Curriculum Vitae, Doc. 30-1, p. 45). He is board-certified in the field of neuropsychiatry. (*Id.*, p. 47). He submitted a report which stated that a neurological physical exam of Brumfield did not disclose any acquired brain damage or ongoing disease. (Merikangas Report, Doc. 30-1, p. 42). He did not testify at the hearing.

Dr. Hoppe is a Louisiana-licensed clinical psychologist who received his Psy.D. in 1981. (Hoppe Curriculum Vitae, Ex. S-55). He has maintained a clinical practice for more than 27 years. (Hoppe Testimony, Doc. 103, p. 157). He was admitted by the Court as an expert in clinical and forensic psychology. (Doc. 103, p. 176). He administered an IQ test to Brumfield in addition to reviewing the available records in this case. (*Id.*, Doc. 104, pp. 7-11). He was unable to interview anyone other than Brumfield because counsel for the State did not provide him with contact information for those persons.[21] (Doc. 104, p. 98, 108). He concluded that Brumfield was not mentally retarded. (*Id.*, pp. 25-26).

---

[21] Dr. Hoppe has previously testified in a state court sentencing, which later came before this Court on habeas review, regarding a defense expert's failure to assess collateral sources of information besides the person whose mental status is being evaluated. *See Koon v. Cain*, No. 01-cv-327-JJB (M.D. La. Feb. 1, 2007) Doc. 111 at **13, 26 (slip op.) (unreported), *aff'd*, 277 Fed.Appx. 381 (5th Cir. 2008) (criticizing defense expert Dr. Zimmerman for not obtaining corroborating data from collateral sources regarding defendant's mental health defense). The Court finds Dr. Hoppe's failure (or inability, if counsel for the State was to blame) to "obtain corroborating data from collateral sources" in this case renders his testimony here suspect.

Dr. Blanche is a forensic psychiatrist who received his M.D. from LSU Medical School in New Orleans in 1981. (Blanche Testimony, Doc. 104, p. 169). He works part-time as a psychiatrist in the East Baton Rouge Parish jail, where he identifies symptoms of mentally ill persons for treatment. (Doc. 105, pp. 8-11). The Court accepted him as an expert in forensic psychiatry. (Doc. 104, p. 183). He interviewed Brumfield at Angola and reviewed the available records. (Doc. 104, pp.184-87). He did not interview anyone other than Brumfield, stating that he felt any information gleaned from outside sources would be unreliable.[22] (Doc. 105, p. 31). Until his deposition in this case in January 2010, Dr. Blanche had never heard of the AAMR/AAIDD and was thus unfamiliar with its diagnostic definitions. (Doc. 104, p. 182; Doc. 105, p. 11). In his work for the jail and in his general practice, he refers persons suspected of mental retardation to a psychologist. (Doc. 105, pp. 7-9). Dr. Blanche received no formal training in administering psychological testing. (Doc. 104, p. 181); *see also State v. Corey Williams*, 831 So.2d 835, 859 (La. 2002) (cautioning courts to not appoint physicians to assess mental retardation because they do not possess the "appropriate expertise"). He concluded that Brumfield does not suffer from mental retardation. (Doc. 104, p. 218).

Dr. Bolter is a clinical neuropsychologist who received his Ph.D. from the University of Memphis. (Bolter Testimony, Doc. 107, pp. 3-5). Since 1988 he has worked at the Neuromedical Center in Baton Rouge. (Doc. 107, p. 3). During Brumfield's murder trial in state court in 1995, he submitted an expert report for the defense and testified at the sentencing phase

---

[22] Dr. Blanche's reticence to speak with members of Brumfield's family and others who knew him might have arisen because, as a State expert, he might be perceived as hostile to Brumfield's interests and thus might receive inaccurate information. Nonetheless, his failure to even make an attempt at corroborating his observations by cross-checking with collateral sources is of fundamental import. The AAIDD guidelines make clear that, especially in forensic diagnosis situations, a holistic review of petitioner's mental status must include these assessments. (*See* User's Guide to 10th Edition, Ex. P-13, pp. 18-22). Ratings by peers, teachers, family members, and others in the subject's community environment are considered crucial. (*Id.*). Dr. Blanche's failure to do so entitles his testimony to comparably less weight than Dr. Weinstein's and Dr. Swanson's, both of whom gave due consideration to the clinical guidelines in this regard.

of Brumfield's trial. (Transcript of Sentencing Phase, Vol. XVI, pp. 3902-10). Dr. Bolter's records were subsequently destroyed, and he remembered little about Brumfield. (Doc. 107, pp. 13-21). As a result, the Court admitted Bolter as an expert in neuropsychology but restricted questions to the scope of his 1995 report. (Doc. 107, pp. 19-20; *see also* Bolter Report, Exs. S-39 *and* P-33). Based on his 1995 report, Bolter found nothing in the report to suggest petitioner was mentally retarded. (Doc. 107, pp. 36-37).[23]

B. Prong 1: Significant Limitations in Intellectual Functioning

The AAIDD recognizes that because "intelligence is best conceptualized and captured by a general factor of intelligence," (10th Edition, Ex. P-11, p. 55), an assessment of intellectual functioning requires "reliance on a general functioning IQ score…." (*Id.*, p. 51). There is no federally-established, bright-line cutoff for persons to qualify as mentally retarded, even using an objective IQ test as the measure for the intellectual functioning prong. *See Atkins*, 536 U.S. at 308-09, n. 3 ("'Mild' mental retardation is *typically* used to describe people with an IQ level of 50-55 *to approximately 70*.") (citing Diagnostic and Statistical Manual of Mental Disorders 42-43 (4th ed. 2000)) (emphasis added); *id.* at 309, n. 5 ("*[A]n IQ between 70 and 75 or lower … is typically considered the cutoff* IQ score for the intellectual function prong of the mental retardation definition." (citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds., 7th ed. 2000)) (emphasis added).

Nor does any codified portion of Louisiana law provide for a numerical cutoff. Louisiana cases have never explicitly found a bright-line cutoff and have consistently rejected imposition of one. *E.g., State v. Shedran Williams*, 22 So.3d 867, 888 (La. 2009) ("[N]either our legislature nor our jurisprudence has set forth a specific IQ score for determining intellectual functioning in

---

[23] This Court respects Dr. Bolter and found his testimony to be credible, but due to his limited records and memory, his testimony does not shed much light on the issues before the Court, especially beause his assessment was not an *Atkins*-tailored inquiry. *See infra*, Part II.D.

the capital sentencing context….").  The cases which have rejected *Atkins* claims based on IQ scores have done so, not simply because of the IQ score, but because other factors relevant to assessing intellectual functioning also pointed toward a finding of non-retardation.  Moreover, those cases have arisen from direct review of a jury's rejection of a mental retardation claim.  For instance, in *Shedran Williams*, 22 So.3d at 888, the defendant had a full scale score of 73 on the WAIS-R test.  *Id.* at 888, n. 16.  The defendant contested the jury's finding of non-retardation on direct review, alleging that the expert testimony of Dr. Hoppe (incidentally, the same expert used by the State in this case) that the ceiling IQ for mild mental retardation was 70 was legal error. *Id.* at 887.  The Court declined to find error in the jury's determination because the jury could also have reasonably found he flunked the adaptive skills prong.  *Id.* at 888.  The Court also noted that the defendant failed to present to the jury how the standard error of measurement might impact the full scale IQ score.  *Id.* at 888, n. 16.  In *Dunn III*, 41 So.3d 454, 470 (La. 2010), the court stated that "scores of 75 brush the threshold score for a mental retardation diagnosis" but ultimately did not disturb on direct review the jury's finding of non-retardation. *See also State v. Lee*, 976 So.2d 109, 146 (La. 2008) (holding that Dr. Hoppe's explanation of "an average IQ as a child of 75.5" as "well over the clinical definition of mild retardation" did not ultimately result in an irrational or unreasonable jury finding of non-retardation).

Mental health literature published by the AAIDD has admonished practitioners to avoid imposition of cutoff IQ scores as well, with the current edition noting that 70-75 is the upper range for mild mental retardation.  (10th Edition, Ex. P-11, pp. 57-59).  Because the Court has found the 10th Edition is the proper source to follow in construing Louisiana's definition of mental retardation, the Court therefore finds that, consistent with Louisiana statutory and case

law, an IQ score of 75 or below does not preclude a finding of mild mental retardation for *Atkins* purposes.

In this case, Brumfield took four different IQ assessments and received the following unadjusted, full scale scores, as reported by petitioner's experts:

- In a 1995 WAIS-R test administered by then-defense expert Dr. Bolter, he scored a 75, with a 95% confidence interval of 70-80.

- In a 2007 Stanford-Binet V test administered by petitioner's expert, Dr. Weinstein, he scored a 72, with a 95% confidence interval of 69-77.

- In a 2007 C-TONI test administered by Dr. Weinstein, he scored a 70, with a 95% confidence interval of 65-75.

- In a 2009 WAIS-IV test administered by the State's expert, Dr. Hoppe, he scored a 70, with a 95% confidence interval of 67-75.[24]

(Summary of Brumfield's IQ Scores, Petitioner's Ex. 3).[25]

Standing alone, these scores appear to meet prong one of the mental retardation test. In Wechsler-scaled tests (such as WAIS-R and WAIS-IV), the standard deviation is 15 and the mean is 100, meaning that 70 represents the score best approximating the cutoff for qualifying under the clinical definition of significantly limited intellectual functioning. *Dunn III*, 41 So.3d at 461-62. The Stanford-Binet V test, unlike previous versions of that test, uses the same measuring guideposts as the Wechsler tests; thus, scoring a 70 on that test would best

---

[24] Suspecting that Brumfield may have not put forth his best effort, Dr. Hoppe gave him a Rey malingering test, which is designed to identify such a situation. Brumfield scored well within the normal range, though Dr. Hoppe still asserts Brumfield somehow outsmarted the malingering test. (Hoppe Testimony, Doc. 104, p. 16). Given the consistently close scores on the IQ tests and the testimony from Dr. Weinstein that such consistently low and close scores could only be accomplished through malingering by a genius—a label manifestly inappropriate for Brumfield—the Court cannot credit Dr. Hoppe's testimony on this issue. The Court therefore finds the 2009 score of 70 on the WAIS-IV test to be valid.

[25] The Court notes that one IQ score listed on the summary chart exhibit was found unreliable because the PPVT test only made an IQ estimate, and thus it cannot be taken into account in assessing Brumfield's intellectual functioning. (Weinstein Testimony, Doc. 102, pp. 117-18).

approximate intellectual functioning two standard deviations removed from the mean. *Id.* Brumfield's scores consistently show him scoring between 70 and 75 on various IQ tests, a range which falls squarely within the upper bounds of mild mental retardation according to the AAIDD's clinical definition.

Every expert that has testified in this matter has admitted that Brumfield meets the intellectual functioning prong of the mental retardation test as set forth in La. C.Cr.P. art. 905.5.1(H)(1). (Greenspan Testimony, Doc. 101, pp. 34, 60-66; Weinstein Testimony, Doc. 102, p. 50; Swanson Testimony, Doc. 106, pp. 49-50; Hoppe Testimony, Doc. 104, p. 71; Blanche Testimony, Doc. 105, pp. 19-20; *see also* Bolter Testimony, Doc. 107, p. 43 (admitting an IQ of 75 qualifies as the upper bound of mild mental retardation)). Nor does the State assert in its briefing that Brumfield fails to meet this part of the test.

Even though all of Brumfield's IQ scores, when assessing the standard error of measurement, show him to potentially be mentally retarded using even the stricter cutoff of 70, courts have sometimes been hesitant to reach into the lower bounds of the standard error of measurement (sometimes referred to as the "margin of error") to make a finding of mental retardation. *See, e.g., Moore v. Quarterman*, 342 Fed.Appx. 65, 80, n. 23 (5th Cir. 2009) (Smith, J., dissenting) (asserting that a preponderance standard cannot be satisfied under Texas law's IQ cutoff of 70 when a petitioner shows an average IQ score above 70, regardless of the standard error of measurement). Crucially, though, Brumfield's full, scaled IQ scores cited above do not take into account the "Flynn Effect." Those unadjusted IQ scores already qualify him as, at a minimum, on the borderline of mild mental retardation, a showing which alone permits inquiry into the second prong under Louisiana's flexible-cutoff approach. *See Dunn III*, 41 So.3d at 470 (noting that persons with IQ scores above 70 can nonetheless be diagnosed as mentally retarded

by heavily depending on a showing of substantial impairment of adaptive functioning). Applying the Flynn Effect to Brumfield's scores would indisputably place him within the range of mild mental retardation.

This phenomenon, named after political scientist James Flynn, found that, over time, the mean IQ scores of the American public on any given test increase by approximately 3 points per decade, or an average of approximately 0.30-0.33 points per year. Flynn measured this increase by simply giving an individual two tests, one of which was an older IQ test that had been normalized to the public at the time of its publishing and one of which was a newly-normalized, recently-published test. Test subjects consistently performed better on the older test than the newer test, leading to the theory that the public on average becomes more intelligent—at least as reflected in mean IQ scores—as times passes. Thus, when an older test is used to measure a test subject, the subject's IQ score may be artificially inflated because that test was normalized using a past sample of Americans. Since the general public's IQ scores have since risen, measuring someone against an older set of norms means measuring someone against a norm set that does not currently reflect the average IQ today, requiring a downward adjustment of the subject's score to account for the subsequent IQ rise of the public which the older test itself does not capture. (*See, e.g.,* User's Guide to 10th Edition, Ex. P-13, p. 20, ¶ 4; *see also* Frank M. Gresham, *Interpretation of Intelligence Test Scores in* Atkins *Cases: Conceptual and Psychometric Issues*, 16 Applied Neuropsychology 91, 93-94 (2009), Ex. P-9; Gilbert S. Macvaugh, III & Mark D. Cunningham, Atkins v. Virginia*: Implications and recommendations for forensic practice*, 37 J. of Psychiatry & Law 131, 148-151 (2009), Ex. P-10).

The Flynn Effect has been widely accepted as a fact in the scientific community, though explaining the cause of this phenomenon has proven more difficult. (Kevin S. McGrew, *Is the*

*Flynn Effect a Scientifically Accepted Fact?*, Institute for Applied Psychometrics (2010), Ex. P-4). Moreover, courts have struggled to determine whether the Flynn Effect should be applied to individual scores and/or whether it should be applied differently depending on the test administered. Neither the Fifth Circuit nor the Louisiana Supreme Court has determined whether to accept the Flynn Effect as a valid method. *See In re Mathis*, 483 F.3d 395, 398, n.1 (5th Cir. 2007) (mentioning that the Flynn Effect has not been accepted as scientifically valid within the Fifth Circuit); *In re Salazar*, 443 F.3d 430, 433, n. 1 (5th Cir. 2006) (expressing no opinion on validity of Flynn Effect); *Dunn III*, 40 So.3d 454, 470, n. 16 (La. 2010) (noting that the Flynn Effect had not been specifically accepted as scientifically valid by the Louisiana Supreme Court); *see also Dunn III*, 40 So.3d at 478-79 (Knoll, J., concurring) (asserting that the Flynn Effect should not be applied to individual IQ scores but that use of outdated tests may be taken into account when making *Atkins* determination).

In the face of this legal uncertainty, the Court gives great weight to the AAIDD's clinical standards, which tip the balance in favor of at least considering the Flynn Effect, even if the Court does not fully embrace all of its contours. *See Wiley v. Epps*, 668 F.Supp.2d 848, 894-95 (N.D. Miss. 2009), *aff'd*, 625 F.3d 199 (5th Cir. 2010) (assessing Flynn Effect holistically as a factor to consider in analyzing IQ scores). The AAIDD's User Guide specifically instructs practitioners to apply the Flynn Effect, especially when presented with a retrospective diagnosis situation, as is the case here. (User's Guide to 10th Edition, Ex. P-13, pp. 17-21). Applying the Flynn Effect would lower Brumfield's 1995 WAIS-R score from 75 to 70, his 2007 Stanford-Binet V score from 72 to 70, and his 2007 C-TONI score from 70 to 65.[26] (Summary of IQ

---

[26] No computation of the Flynn Effect on his 2009 WAIS-IV score of 70 was made, but that is unnecessary because that score already undoubtedly qualifies as showing mild mental retardation.

Scores, Ex. P-3). Thus, the Flynn Effect would place those scores solidly and indisputably into the mildly mentally retarded level.

Given that (1) every single testifying expert—both petitioner's and the State's—agrees that Brumfield has satisfied the intellectual functioning prong, (2) the unadjusted IQ scores permit inquiry into the other parts of the test under Louisiana's flexible-cutoff approach, and (3) the Flynn Effect-adjusted scores place all of Brumfield's IQ scores at or more than two standard deviations below the mean, the Court finds Brumfield has met his burden and shown by a preponderance of the evidence that he has significant limitations in intellectual functioning. Prong One is met.

C. Prong Two: Significant Limitations in Adaptive Behavior as Expressed in Conceptual, Social, and Practical Adaptive Skills

Prong Two involves an assessment of Brumfield's adaptive skills in the areas of conceptual, social, and practical skills. He must show a significant limitation in at least one of those three domains to satisfy the adaptive skills prong. (See 10th Edition, Ex. P-11, Table 1.2, p. 14). The AAIDD's 9th Edition defined significant limitation in adaptive skills as someone who exhibited deficits in at least two of the following ten areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. (Id., Table 2.1, p. 21). The 10th Edition moved away from that scheme of categorization, instead forming three clusters of related skills and requiring a significant limitation in one of those broader domains. (Id., Table 5.2, p. 82).

Conceptual skills include language skills, reading and writing abilities, self-direction, and grasping concepts of money. (Id.). These conceptual skills may be collectively labeled as functional academics. (Id.).

Social skills focus on interpersonal relationships, responsibility, self-esteem, gullibility/naivete, following rules/obeying laws, and avoidance of victimization. (*Id.*).

Practical skills focus on self care and daily living. (*Id.*). Such skills include preparing and eating meals, dressing, toileting, personal mobility and use of transportation, occupational skills, health care, and maintenance of safe environments. (*Id.*, Table 3.1, p. 42).

The AAIDD prefers that practitioners utilize standardized testing in these areas, and like the intellectual functioning prong, a showing of significant limitation requires a score two standard deviations below the mean. (*Id.*, p. 76). However, in retrospective diagnosis situations, it is often difficult to assess such limitations simply by giving a subject and his inner circle a questionnaire to fill out. (User's Guide to 10th Edition, Ex. P-13, p. 17). Rather, the guidelines in this situation call for additional inquiry into the subject's past, including interviews alongside questionnaires. (*Id.*, pp. 18-22).

In this case, Brumfield and several people who knew him well were given ABAS-II questionnaires by Dr. Weinstein in 2007 and 2009 in an effort to obtain relatively objective measures of Brumfield's adaptive skills. (ABAS-II Questionnaires and Results, Petitioner's Exs. 48-52). However, Weinstein explained that the scores on the ABAS tests could not be given preclusive effect in assessing Brumfield's adaptive skills and cautioned that they might not be wholly reliable. (Weinstein Testimony, Doc. 102, p. 59). Depending on the person, these tests sought input as to Brumfield's past ability in his childhood to perform certain tasks. Brumfield was born on January 7, 1973, and these backward-looking questions rely principally upon the memories of the test-takers regarding Brumfield's abilities dating back 15-20 years. Some of them have emotional incentive to lie or exaggerate (such as Brumfield's mother, sister, and his child's mother) in order to spare him the penalty of execution. Others, such as Brumfield's

former teacher, may or may not have a clear recall of events since he was only one of many hundreds of students she taught over her career. Brumfield does not rely on these scores in his briefs, the State does not either, and in any event the guidelines for retrospective diagnoses of mental retardation eschew total reliance on this type of information in favor of interviewing relevant persons with knowledge of petitioner and cross-checking that information with school records, social history, and other more objective indicia. (User's Guide to 10th Edition, Ex. P-13, pp. 18-22). The Court finds these tests to be of little or no value and therefore will not address the results of the ABAS-II exams.[27]

Without reliable standardized measures available, the Court must rely on the testimony of the expert witnesses and their reports, the Court's independent evaluation of Brumfield's social, educational, medical, and criminal histories, and a common sense appraisal of Brumfield's actions and abilities. In this regard, several considerations stressed in the clinical literature bear repeating. As the AAIDD's operational assumptions make clear, "people with mental retardation are complex human beings" who may have "strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation." (10th Edition, Ex. P-11, p. 8). Thus, diagnosis of mental retardation "is ruled in by areas of impairment but is not ruled out by areas of competence." (Greenspan Testimony, Doc. 101, p. 75). Mental retardation is essentially a disorder of thinking rather than learning. (*Id.*, pp. 40-41). Breakdowns in routine require higher-level problem-solving abilities and critical thinking skills that even mildly mentally retarded persons often lack. (*See id.*). Mentally retarded persons can read and write but usually only up to a fifth or sixth grade level. (*Id.*, p. 43). Mildly mentally retarded persons have mental abilities of seven to eleven year old children. (Summary of American Psychological Association's Characteristics of Mildly Mentally Retarded Individuals, Ex. P-60)

---

[27] For whatever they are worth, the scores showed Brumfield with very significant adaptive deficits.

While "[a]daptive behavior is considered to be conceptually different from maladaptive or problem behavior," it is nonetheless important to recognize "that the function of inappropriate, or maladaptive, behavior may be to communicate an individual's needs, and in some cases, may even be considered 'adaptive.'" (10th Edition, Ex. P-11, p. 79). The Court must take into account the retrospective diagnostic guideline admonishing practitioners to "not use past criminal behavior or verbal behavior to infer level of adaptive behavior," (User's Guide to 10th Edition, Ex. P-13, p. 22), because "adaptive behavior and problem behavior are independent constructs and not opposite poles of a continuum." (*Id.*, p. 20). The reasons for not using maladaptive criminal behavior to assess adaptive skills are several: (1) the defendant may have gullibly acted under the direction or training of a confederate during the crime; (2) there may not be available enough accurate details about the facts of the crime from which to draw adaptive conclusions; and (3) in any event, there is a lack of normative information about actions during and following crimes to be able to meaningfully assess whether and how much a defendant's actions deviated from the mean adaptive behavior during criminal acts. (*Id.*; Greenspan Testimony, Doc. 101, pp. 121-26; Swanson Testimony, Doc. 106, pp. 117-23).

On the other hand, the Court must also remain cognizant of the propensity of Louisiana courts to take such maladaptive criminal behavior into account when discussing the adaptive skills prong of the mental retardation test. The Louisiana Supreme Court has in several instances discussed the criminal actions of an *Atkins* petitioner when assessing that person's adaptive skills.

In *State v. Brown*, 907 So.2d 1, 45-47 (La. 2005), the Louisiana Supreme Court examined on direct review the defendant's actions immediately following the crime, including destruction of evidence, in light of defendant's contention that a gunshot incurred by him in a previous

criminal episode damaged his brain's frontal and temporal lobes and deprived him of his ability to make reasonable choices. The *Brown* Court rejected defendant's contention in light of the fact that no expert testified that he was mentally retarded. *Id.* at 46-47. In *State v. Scott*, 921 So.2d 904, 959 (La. 2006), *overruled in part on other grounds by State v. Dunn II*, 974 So.2d 658 (La. 2008), the Court on direct review succinctly noted that "the defendant's behavior during and following the commission of the crime can be relevant to the determination of mental retardation." In *State v. Lee*, 976 So.2d 109 (La. 2008) the Louisiana Supreme Court evaluated on direct review "[t]he complexity, scope, planning, and relative skill with which defendant committed" his crimes as evidence of strength in adaptive skills. 976 So.2d at 147. In *State v. Anderson*, 996 So.2d 973, 991 (La. 2008), the Louisiana Supreme Court, like in *Brown*, analyzed on direct review the evasive steps defendant took in the wake of committing the charged crime, noting that "[s]uch organized behavior to cover his tracks, suggests a level of intellectual awareness of right from wrong, and could have formed the basis for the jury to determine that defendant's adaptive skills were not retarded." In *State v. Shedran Williams*, 22 So.3d 867 (La. 2009), the Louisiana Supreme Court found that the jury could have discredited the defense's expert witness because he failed to interview eyewitnesses to the crime who might have had an opinion on the defendant's behavior prior to and during its commission. 22 So.3d at 885.

Notably, all five of these cases—*Brown*, *Scott*, *Lee*, *Anderson*, and *Shedran Williams*—affirmed on direct appeal a jury's assessment of death in the penalty phase of trial where the mental retardation issue was actually litigated. The difference in procedural posture between those cases and this case is not insignificant. When the Louisiana Supreme Court directly reviews a jury's death sentence verdict, it does so under the standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires a court to assess whether any rational factfinder,

when viewing the evidence in the light most favorable to the prosecution, could conclude that the defendant failed to prove by a preponderance of the evidence that he was mentally retarded. *See Shedran Williams*, 22 So.3d at 881-82. Because the Louisiana Supreme Court was tasked in those cases with affirmatively searching for reasons to uphold a jury verdict if they existed—meaning that expert testimony was construed wholly in the State's favor and against the defendant—it was obviously entitled to make an adaptive skill assessment based on potential juror inferences from the facts of the crime itself.

*State v. Dunn (III)*, 41 So.3d 454 (La. 2010), is the only Louisiana Supreme Court case on point with a procedural posture comparable to this one.[28] That Court found that it was "important to consider the defendant's behavior during the planning and commission of the instant crime," 41 So.3d at 471, when the plan showed "premeditative aspects" and that the defendant lacked "the impulsiveness and non-leadership interactions associated with mentally retarded persons," at least when the trial evidence showed those skills to be "firmly established facts…." *Id.* at 472. While the Court admitted that showing weaknesses "of some adaptive skills … would not necessarily preclude a finding of mild mental retardation," it ultimately affirmed the trial judge's determination that the defendant had not met his burden to show mental retardation. *Id.* at 472-73.

A fair-minded reading of *Dunn III* establishes that courts certainly should consider evidence of the criminal action in the overall assessment if "firmly established facts" show clear instances of premeditation and leadership which tend to preclude, for instance, the possibility that the petitioner gullibly followed the direction of another or relied on impulse rather than a plan. These directives are not inconsistent with the 10th Edition's recognition that maladaptive

---

[28] Dunn had been convicted of capital murder but, after *Atkins*, his retardation claim was decided by a state trial judge after several days of hearings. 41 So.2d at 457-58.

criminal actions can in some rare instances be considered adaptive behavior.  However, as Dr. Greenspan noted, because there are few studies showing normative behavior during commission of a crime, courts must be wary of drawing conclusions from those actions alone.  *Dunn III* was a rare case where those circumstances were met.  However, far from establishing a categorical imperative that courts must give great weight to petitioner's actions during the crime, *Dunn III* simply supports giving a court discretion to consider those facts when and if they are relevant to a particular adaptive skill.  *Dunn III*, 41 So.3d at 471 (stating that "the defendant's behavior during and following the commission of the crime *can* be relevant to the determination of mental retardation") (quoting *Scott*, 921 So.2d at 959) (emphasis added).

Ultimately, the State's position seems to be that the facts of the underlying crime compel a finding of non-retardation.  That position does not comport with the clinical guidelines.  While it is true that the Louisiana Supreme Court has at times taken the criminal facts into account (notably, only when the jury or, in one case, the judge found non-retardation), that Court has never repudiated the clinical guidelines; indeed, it has consistently endorsed them.  The main thrust of Louisiana jurisprudence on this issue does not cabin a court's discretion in derogation of the clinical guidelines.  In assessing the weight to be given the criminal facts, this Court lends great credence to the clinical admonitions that using those facts to determine adaptive skills is at best a haphazard and risky business.  As will be shown below, on the facts presented here, the criminal facts the State relies on are entitled to relatively little weight.

With these important precepts in mind, the Court must endeavor to navigate the murky waters of adaptive skills.  While both Dr. Weinstein and Dr. Swanson testified regarding Brumfield's adaptive skills, only Dr. Blanche made determinations as to Brumfield's adaptive skills.  (Hoppe Testimony, Doc. 106, p. 68 (asserting that Dr. Blanche was focusing on the

adaptive skills prong while he focused on the intellectual functioning prong); Blanche Testimony, Doc. 105, p. 29 (asserting that his sole focus was on the adaptive skills prong)). As previously discussed, Dr. Blanche's failure to adhere to the AAIDD's clinical standards must be taken into account when assigning credit to the often-conflicting testimony.

### 1. Conceptual Skills

The first category of adaptive skills to be considered is the realm of conceptual skills, which includes language skills, reading and writing abilities, self-direction, and grasping concepts of money, which may be collectively labeled as functional academics. (*See* 10th Edition, Ex. P-11, p. 82). Functional academics are concepts used in the real world rather than in the classroom. (Greenspan Testimony, Doc. 101, pp. 72-73).

Brumfield's writing abilities are severely limited. While this limitation is partially related to his lack of motor skills in this particular area, the Court heard testimony that he must use a piece of cardboard to write in a straight line, that he cannot write freehand, and that he takes an inordinate amount of time to write a simple, one-page letter. (Weinstein Testimony, Doc. 102, pp. 72-73). Brumfield requires assistance from other death row inmates to write his letters, (*id.* at 78-79), and thus the reliance by the States' experts on the quality of his expressions in his prison correspondence is misplaced. (*See also* Letter from Brumfield to Richard Donald dated March 16, 2010, Ex. P-24 (referencing "the guy that helps me with my letters"); Swanson Testimony, Doc. 106, p. 93-99 (referencing teacher who let Brumfield copy things during class with aid of cardboard piece and testifying generally to Brumfield's writing limitations)).

The State does not contend that Brumfield has adequate reading abilities. Dr. Swanson listened to Brumfield read some of the letters he wrote and found that his reading was on a fourth grade level. (Doc. 106, p. 104). The reading materials in his prison cell are targeted to middle

school audiences and are consistent with someone who has mental retardation. (*Id.*, pp. 100-106).

Brumfield has a dismal record of academic accomplishments in the classroom. Although Brumfield was always behind in school due to his developmental delays (Weinstein Testimony, Doc. 102, p. 69), his progress stalled completely in middle school. He reached a plateau somewhere between the fourth and sixth grade, which is where mildly mentally retarded individuals generally fall. (Swanson Testimony, Doc. 106, p. 86). Although Brumfield was never held back, his teachers were insistent that he not be promoted, but the principal gave him a "social promotion." (Swanson Testimony, Doc. 106, pp. 73-74). School testing records show lack of competence in virtually every area. In eighth grade, Brumfield tested two standard deviations below his age group in standardized testing—he read at the third grade level, did math at the third grade level, and wrote at the fourth grade level. (Swanson Testimony, Doc. 106, p. 85). His prior testing during the fifth grade revealed similar deficits. (*Id.*, pp. 68-71).

Because of Brumfield's severe academic challenges, his teachers and school officials attempted to identify the problem(s) with his learning. Unfortunately, he was constantly shuttled between different schools and remained periodically in-and-out of mental health centers and special education classes beginning in the fifth grade. (*See* East Baton Rouge Parish Schools Pupil Appraisal of Kevan Brumfield, Ex. P-27). A constant refrain of the teacher and specialist assessments was his need for a highly structured environment in order to provide the necessary supports for him to function. (*See* Brumfield School Records, Ex. P-27). In all, Brumfield attended 14-15 schools prior to eventually dropping out in 1989 at age 16. (LeGuin's Report on Brumfield's Social History, Ex. S-37, p. 21). During the period from January 1984 to May 1989

when Brumfield was in special education, he was placed in at least 10 different schools. (Swanson Report, Doc. 30-1, p. 26).

In response, the State essentially argues that Brumfield's lack of prior mental retardation diagnosis forecloses a retrospective diagnosis based on the level of attention his mental health received during his formative years. Brumfield concedes that Dr. Weinstein was the first person to diagnose him with mental retardation, despite prior testing to determine the genesis of his academic and behavioral problems. (Weinstein Testimony, Doc. 102, p. 108). The State argues that the diagnoses during Brumfield's school years—conduct disorders, under-socialization, and aggressiveness—show a conspicuous lack of mention of mental retardation, which should preclude a retrospective diagnosis at this point in time. But Dr. Swanson adequately rebutted this *expresio unius*-like argument. In the late 1970s and early 1980s, black male students were being disproportionately diagnosed as mentally retarded. This apparent over-diagnosis problem caused an overcorrection by school officials, who were cautioned not to over-represent that demographic by instead diagnosing them with a related disorder that would avoid the mental retardation label but still allow for the same level of educational services to be provided that individual student. (Swanson Testimony, Doc. 106, pp. 51-60). As the User's Guide makes clear, political correctness and worry about negative stigmatization has often played a role in preventing prior diagnosis of mental retardation. (Ex. P-13, p. 18). Because the school appraisal teams might have looked past factors pointing toward Brumfield's mental retardation in favor of diagnosing him with more politically palatable ailments, like conduct disorders and behavioral problems, the Court refuses to treat his lack of prior diagnosis as preclusive.[29] Moreover,

---

[29] Article 905.5.1(H)(2) likewise does not preclude a finding of mental retardation even if the symptoms exist in tandem with other related disorders. Moreover, the clinical literature recognizes that mildly mentally retarded individuals often suffer from many of the same disorders listed in article 905.5.1(H)(2). (User's Guide to 10th Edition, Ex. P-13, pp. 15-16). Thus, contrary to the State's contention, prior diagnosis of other, related mental

Brumfield never previously underwent testing aimed specifically at determining mental retardation. A lack of mental retardation diagnosis in the face of *general* aptitude and behavioral testing differs in kind from an affirmative non-diagnosis in light of *specifically tailored* testing for mental retardation, which Brumfield never received until this case commenced.

The State also points to several practical facts which it asserts show Brumfield's functional academic skills were not grossly deficient in the area of conceptual skills. Dr. Blanche notes that Brumfield must have had a basic grasp of economic and monetary concepts because he left his job as a restaurant cook to make more money selling drugs. (Doc. 104, pp. 210-212). Both Dr. Hoppe and Dr. Blanche talk about the multi-tasking skills needed to deal drugs, including an ability to avoid police detection, to count money, and to ascertain the correct amount of drugs to distribute in each deal. (Hoppe Testimony, Doc. 104, pp. 41-42; Blanche Testimony, Doc. 104, pp. 210-12). Common sense dictates that those are certainly traits that "successful" drug dealers should possess. But did Brumfield actually possess those traits? The record is barren of any testimony regarding his efficacy in drug transactions. Perhaps he guesstimated what amounts of drugs were sufficient for the price a customer was willing to pay. Perhaps he had others count the money for him or divide the drugs into set quantities for sale at a set price. Or perhaps Brumfield was actually a savvy drug merchant. The point is that we simply have no testimony establishing what Brumfield did or did not do well during his drug dealing days. Nothing in the record shows that Brumfield actually exhibited traits consistent with being a "successful" drug dealer, making the State expert's theorizing about Brumfield's success dealing drugs inadequate to show an adaptive strength in this regard.[30]

---

health disorders, like the undersocialized, aggressive conduct disorder diagnoses from this childhood (*see* Doc. 104, pp. 130-36), do not preclude and could be consistent with mental retardation.

[30] In fact, it appears that Brumfield operated as a street drug dealer selling nickel and dime bags provided to him. (Doc. 104, pp. 41-43).

Blanche elaborated on other perceived adaptive skills, including Brumfield's "ownership" of a car, his cash transactions in renting motel rooms, and his contributions to his girlfriend. (Blanche Testimony, Doc. 104, pp. 213-15). These assertions have more solid factual foundation. There is no dispute that Brumfield acquired a car prior to and in connection with the crime, though the record shows that rather than owning the car, he simply used his access to drugs to barter for its use—a "street rental." (Doc. 103, p. 27). In any event, this testimony, even if accepted at face value, does not negate the possibility that Brumfield had significant deficits in the domain of conceptual skills. It is a truism of mental retardation analysis that strengths may coexist alongside weaknesses. Even if Brumfield was able to conduct a transaction for a motel room or operate a car, those skills are not inconsistent with mental retardation. Blanche himself conceded that, based upon his interview, Brumfield had skills and knowledge equivalent to a ten-year-old child. (Doc. 105, pp. 52-55). Mildly mentally retarded people generally have mental ages ranging from seven to eleven. (Summary of American Psychological Association's Characteristics of Mildly Mentally Retarded Individuals, Ex. P-60). It is not inconceivable for someone around the age of ten to have the mental capacity to conduct a relatively simply economic transaction like renting a room, especially if receiving help from another source like a girlfriend.

The ABAS-II scores, for what they are worth, consistently show that Brumfield's lowest assessed scores are in the area of functional academics. (*See* ABAS-II scores, Exs. P-48-52). Dr. Swanson unequivocally testified that Brumfield had significant deficits in the area of functional academics and that he was significantly impaired in the area of conceptual skills as defined by the AAIDD. (Doc. 106, pp. 129-30).

The State counters with two arguments: first, it points to Brumfield's videotaped confessions, which it asserts show a poised, manipulative person with at least average adaptive functioning; and second, that the facts of the murder for which Brumfield was convicted show that Brumfield had the ability to premeditate and lead a heinous crime.

Brumfield's confessions show composure and clear answers to direct questions. (*See* Brumfield Confession Tapes, Exs. S-15, S-17). But as Dr. Swanson correctly identified, during his first interrogation, Brumfield deliberately lied about his educational achievements and therefore masked his deficits by stating he graduated from high school and made "As and Bs" throughout school; in reality, of course, he achieved neither. (Doc. 106, p. 106). Swanson testified that the first confession tape shows he acquiesced to answers that were cued and prompted by his questioner. (*Id.*, p. 107). In the second taped confession, because it appears Brumfield had been discussing the topic for a longer period of time, his responses were quicker in taking his questioner's cues and also longer because he had practiced speaking on the topic already. (*Id.*, p. 108). These traces of suggestibility are consistent with mental retardation, according to Dr. Swanson. (*Id.*, pp. 109-112). Even without wholly accepting Dr. Swanson's theory of his confessions—they are undoubtedly legally valid and non-coercive—her testimony is credible, and the Court therefore cannot find the taped confessions to be dispositive evidence on non-retardation, as the State would have it.

A recording of Brumfield's outgoing phone calls from prison (Ex. S-35) shows nothing extraordinary that a normal ten-year-old child could not do.[31] Talking about making purchases online, conversing about sports scores and stats, and the like are simply not sufficient to show

---

[31] For the same reasons, the Court finds Brumfield's conversation with Warrick Dunn, the victim's son, not particularly probative. The fact that Brumfield knew some of his football stats and what some of his siblings were doing shows only that Brumfield anticipated and prepared for the meeting, which occurred in the highly-structured prison environment. But it must be noted that Dunn's willingness to confront and, ultimately, forgive his mother's killer shows remarkable bravery.

adaptive strength in communication abilities.  Even so, because strengths can coexist alongside weaknesses, one or two instances of him exhibiting oral communication skills expected of adults could hardly be said to outweigh the other documented adaptive weaknesses in the conceptual domain.  As the diagnostic guidelines state, "adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning."  (User's Guide to 10th Edition, Ex. P-13, p. 20).

Finally, Brumfield's actions during and immediately following the underlying murder for which he was convicted must be discussed.  In many cases, criminal actions will more readily be applicable to social and practical skills than conceptual skills.  Capital murder is the only offense where *Atkins* becomes relevant, and in large part these acts of violence show competence in the criminal's ability to manipulate weaponry and other machinery, such as cars.  While evading police and avoiding capture can exhibit raw physical skills, at other times those acts are just as consistent with primal survival instincts as they are with callous, cold-blooded calculation.  Such an instance would not, of course, excuse the act itself or its aftermath in any way, but in a certain factual context it might place the evasion into a different category for purposes of evaluating adaptive skills.  As noted above, it is only the rare case where there will be firmly established facts from a criminal episode that can establish strengths in adaptive skills.  This is especially true when evaluating the language skills and reading and writing abilities that form part of the conceptual domain.  In this case, those abilities were not readily implicated by the facts of the crime itself, and therefore the Court must look to the crime for evidence, if any, of conceptual skills in the areas of self-direction and abstract reasoning.

As mentioned above, courts sometimes look to premeditation of and leadership during commission of the crime in affirming non-retardation conclusions based on strengths adaptive

skills.  In this case, Brumfield acted along with other confederates in executing their criminal scheme which ultimately left a police officer dead.  To briefly recount the facts as contained in Brumfield's confession, Brumfield and his two confederates decided to conduct an armed robbery of a Piggly Wiggly grocery store manager while making a night deposit at a Baton Rouge bank.  Brumfield and another lay in wait in some bushes adjacent to the bank.  The grocery manager arrived at the bank in a police car with her off-duty escort, Corporal Betty Smothers.  Brumfield and his confederate simultaneously emerged from the bushes, with each man firing shots into a side of the vehicle.  Brumfield, approaching the driver's side, fired several shots which struck and killed Cpl. Smothers, the driver.  His confederate approached the passenger side and fired shots into the vehicle from that direction, but the manager, from the passenger seat, succeeded in driving the car away from the bank.  (Second Brumfield Confession Videotape, Ex. S-17).  Brumfield was later arrested and gave a false confession minimizing his role, but about 14 hours later he ultimately confessed to his true role in the crime.  (*Compare* First Brumfield Confession Videotape, Ex. S-15, *with* Second Brumfield Confession Videotape, Ex. S-17).

The State fails to bring forward firmly established facts showing demonstrable leaderships skills during the crime.  One of Brumfield's confederates is currently on death row and does not have a pending *Atkins* claim, suggesting the possibility that Brumfield was gullibly convinced to join in the crime instead of actively planning out its details.  Moreover, nothing in Brumfield's confession makes clear that Brumfield, rather than another of one his confederates, "led" this terrible scheme, and the State in its briefing points to nothing else from his trial record showing a form of criminal leadership sufficient to "firmly establish" that point.  Nevertheless, it is true that elements of premeditation and planning were involved.  Brumfield admitted to having

previously seen other night deposits at the bank occur while he drove around the streets of Baton Rouge looking for potential robbery victims. He also lay in wait in the bushes by the bank for approximately 15 minutes before the victims arrived, demonstrating that he did not rely wholly on impulse to commit the crime. (Second Brumfield Confession Videotape, Ex. S-17). But is this particular instance sufficient to overwhelm the other demonstrated showings of adaptive deficits in conceptual skills? It should not be. As the clinical guidelines admonish, isolated occurrences of adaptive strengths by definition do not show typical functioning levels. Brumfield's confession tapes occur in a highly structured environment at the police station in response to firm and specific questioning. Needless to say, up to that point Brumfield's typical environment selling drugs on the street offered much less structure. While the confession surely shows the underlying facts of the crime, alleviating one of the three primary concerns clinicians have had with using facts from a crime in assessing adaptive skills, those facts themselves fail to demonstrate premeditation or leadership qualities that so surpass the functioning levels of a typical mildly mentally retarded person so as to conclusively establish non-retardation as a matter of law. Moreover, direct expert testimony from Dr. Swanson established to this Court's satisfaction that those tapes are not inconsistent with a person who has mild mental retardation.

It bears repeating that the posture of this case does not bring Brumfield before this Court on direct review of a jury's imposition of the death penalty following evidentiary presentation on the issue of retardation. Rather, this Court must view, more or less in isolation, whether Brumfield meets the clinical criteria. Dr. Blanche, the State's expert, lacked basic knowledge about the AAIDD's standards until he was deposed in this case shortly before the hearing. Additionally, as the Louisiana Supreme Court has observed, his status as a physician rather than a psychologist harms his credibility because he lacks some of the appropriate expertise to be able

to comment on certain diagnostic matters, as his lack of knowledge about the AAIDD shows. *Corey Williams*, 831 So.2d at 859. Additionally, Dr. Blanche failed to conduct interviews with anyone other than Brumfield himself, which runs afoul of the basic guidelines for retrospective diagnoses. Compared with him, the Court simply found more credible the testimony of Drs. Weinstein and Swanson. While Brumfield's confession tapes may at times show evidence of certain adaptive strengths in the area of language skills, they do not obviate his obvious conceptual deficits. Brumfield's maladaptive behavior in committing felony murder makes him unsympathetic and deserving of the maximum punishment available under the law, but it does not necessarily take away from the other manifested deficits in adaptive skills. Moreover, the Court cannot accord great weight to the facts of the crime, even though they must be taken into account, because the diagnostic guidelines for assessing maladaptive behavior as a part of adaptive skills have not been sufficiently shown to be present in this case. When courts have reason to doubt that facts from a crime are "firmly established" to show whether the defendant exhibited leadership during or detailed premeditation of a criminal enterprise, following the clinical guidelines (which explicitly forbid use of maladaptive criminal behavior in assessing adaptive skills) provides the surest means of accurate fact-finding. The Court duly takes into account the facts of the crime, but in this posture those facts alone cannot control.

Ultimately, the Court finds that, based on the credibility of petitioner's witnesses combined with the documented problems with the bases of testimony by the State's experts, Brumfield has shown by a preponderance of the evidence that he has significantly limited conceptual skills. When holistically assessing his strengths and weaknesses in the areas of language skills, reading and writing abilities, self-direction, and abstract reasoning, the Court finds that, on balance, the evidence shows he meets the AAIDD's definition of mental

retardation with respect to the conceptual domain of adaptive behavior. Prong Two is therefore met since Brumfield has shown a significant deficit in one of the three domains of adaptive functioning.

### 2. *Social Skills*

Because Brumfield's deficit in conceptual skills satisfies Prong Two of the mental retardation test, the Court will conduct only a brief review of the other two domains.

Social skills include interpersonal relationships, responsibility, self-esteem, gullibility/naivete, following rules/obeying laws, and avoidance of victimization. Brumfield's interpersonal relationships received little discussion at the hearing. He clearly has skills adequate to attract partners, as he has several children by different women. No showing was made of significant deficits in this factor.

Responsibility was also a factor that did not receive much attention on its own, though this factor ties into the other factor regarding following rules and obeying laws. The Court heard testimony that Brumfield's brother had to do his chores for him as a child because he either forgot to do them or could not perform the tasks assigned. (Weinstein Testimony, Doc. 102, p. 67). The record is replete with instances of Brumfield not following the rules at school, as evidenced by his diagnosis as behaviorally disordered. Of course, the Court would not be making this analysis if Brumfield was able to obey the law. Significant testimony was received regarding his inability to follow even simple instructions and rules of games. (Weinstein Testimony, Doc. 102, p. 69). Even Dr. Blanche admits that this was a deficit. (Blanche Testimony, Doc. 105, p. 40).

Nothing in the record shows that Brumfield suffered a deficit in self-esteem. Indeed, he thought himself above the law, not just with his brazen criminal actions throughout his late

adolescence leading up to the murder, but also his statements that he would drive as fast as he wanted to. (Blanche Report, Ex. S-44, p. 9).

With regard to gullibility and naivete, Brumfield was apparently hoodwinked into attending Camelot College when representatives of that institution came into his neighborhood and said he could obtain a loan to go to school there, (Weinstein Testimony, Doc. 102, pp. 82-83), a fact which Dr. Hoppe essentially concedes. (Hoppe Testimony, Doc. 104, pp. 118-20).

Avoidance of victimization is another factor to which the experts did not devote much time. From the Court's review of the record, Brumfield does not appear to have been particularly susceptible to being victimized. In fact, his attendance at Camelot College notwithstanding, it appears Brumfield used his aggression to insulate himself from attempts to victimize him.

Based on these criteria, Brumfield appears to have strengths in interpersonal relationships, self-esteem, and avoidance of victimization. He has shown some evidence of deficit in the gullibility/naivete factor, and he has unquestionably shown strong evidence of significant deficits with regard to responsibility and following rules/obeying laws. On balance, this domain is a close call, but the Court does not find Brumfield meets the criteria for a significant overall deficit in the domain of social skills.

### 3. Practical Skills

Practical skills represent abilities in self care and daily living, such as preparing and eating meals, dressing, toileting, personal mobility and use of transportation, occupational skills, health care, and maintenance of safe environments.

The record contains occasional references to Brumfield's poor hygiene in certain respects, but apart from that, no credible evidence suggests he is unable to care for himself in the

course of daily living.[32]  No showing has been made that he lack the ability to provide himself with meals, dress himself, use the toilet properly, or otherwise lacks modes of personal transportation.  Indeed, he has shown his ability to make use of a car by obtaining a "street rental" and operating the car before, during, and after the murder for which he was convicted.  Even if his activity during the crime may not have been "typical" as defined in the diagnostic guidelines, Brumfield has made no showing that he lacks these skills.

Occupationally, he was able to work as a cook on a couple of occasions, though his efficacy at that job is unclear.  He obtained at least one of those jobs through his girlfriend and only stayed for a few months before moving on to drug-dealing.  As previously discussed, he occupational skills at drug-dealing are far from clear, if such skills can even contribute to "gainful employment" as used in the literature.

Little evidence exists regarding Brumfield's health care, though on at least one episode he went to the hospital for treatment of a gunshot wound.  (*See* Guin's Social History Report, Ex. S-37, p. 13).  Brumfield consciously placed himself in harm's way by dealing drugs and knowingly involved himself with the dangerous and violent situations that lifestyle inherently entails.  He thus cannot be said to have maintained a "safe environment."

The Court finds Brumfield has not met his burden of showing he has significant deficits in practical skills.

D.  <u>Prong Three:  Onset Before Age Eighteen Based on Etiology</u>

The third prong requires that the deficits in intellectual functioning and adaptive skills exhibit themselves before the petitioner reaches adulthood.  Etiology is the study of causative factors that put persons at risk for diseases, including mental retardation.  Because etiology ties

---

[32] The parties' experts disagree on when Brumfield could first tie his shoes, but the Court finds that fact entitled to little weight when compared to his other demonstrated strengths in the same area.

in to the timing of the onset of mental retardation, some of its evaluative factors apply with equal force to the first and second prongs.

The State's experts spent little time discussing this part of the test. As Dr. Weinstein remarked in his unrebutted testimony, "I don't think there is any question by anybody that [Brumfield] was not able to function adequately and he had development problems. Some people may question or may have some disagreement on whether it's mental retardation, learning disability, something else. But there is no question that he had very serious problems from very early on in life." (Doc. 102, p. 87). Dr. Swanson likewise made that same conclusion in her expert report on Brumfield's social history. (Doc. 30-1, p. 30). Dr. James Merikangas conducted a neurological exam on Brumfield in 2007 which failed to disclose any acquired brain damage or ongoing disease that might negate the existence of an organic reason for Brumfield's mental retardation. (Merikangas Report, Doc. 30-1, p. 41).

The State correctly points out that, prior to his *Atkins* claim, Brumfield had never been diagnosed as mentally retarded. In particular, Dr. Hoppe reviewed Brumfield's medical and school records and concluded that no less than six doctors performed psychological testing on Brumfield and none of them diagnosed him with mental retardation. (Hoppe Psychological Evaluation, Ex. S-42, pp. 7-9; Hoppe Testimony, Doc. 104, pp. 53, 63-64; Greenspan Testimony, Doc. 101, p. 208 (listing experts who previously evaluated Brumfield)). Dr. Blanche made a similar conclusion in that the school had a financial incentive to make all diagnoses they could in order to receive extra education funding. (Blanche Report, Ex. S-44, p. 6; Blanche Testimony, Doc. 105, pp. 12, 28, 36).

Courts justifiably view with suspicion made-for-litigation diagnoses. *See Dunn III*, 41 So.3d at 472. On the other hand, though, sometimes litigation serves as the impetus for narrowly

focusing on a person's abilities based on specific diagnostic criteria rather than relying on wide-ranging evaluations which may overlook certain facts peculiar to a mental retardation inquiry. The AAIDD's clinical guidelines do not preclude a retrospective diagnosis of mental retardation, even if the subject received childhood psychological testing. (*See* User's Guide to 10th Edition, Ex. P-13, p. 17).

As already noted above in Part II.B, Dr. Swanson has given the Court a compelling reason to not draw a negative inference due to the lack of childhood diagnosis. She points out that during Brumfield's school years in the late 1970s, African-Americans males were bring disproportionately diagnosed with mental retardation. (Doc. 106, p. 55). School officials, psychologists, and appraisal teams were accordingly cautious not to over-represent black males as being mentally retarded and were instead urged to consider other alternatives that would avoid placing the mental retardation label on them. (*Id.*). Swanson confirmed that East Baton Rouge Parish schools, which Brumfield attended, had received this admonition. (*Id.*). AAIDD standards confirm that lack of an earlier mental retardation diagnosis may indeed be attributable to that pressure. The User's Guide recognizes that "the school's concern about over-representation for data reporting purposes of specific diagnostic groups within their student population" might require a retrospective analysis. (Ex. P-13, p. 18). It also acknowledges that a person might be "given no diagnosis or a different diagnosis for 'political purposes' such as protection from stigma or teasing, avoidance of assertions of discrimination, or related to conclusions about the potential benefits or dangers of a particular diagnosis." (*Id.*). Because the school appraisal teams might have looked past factors pointing toward Brumfield's mental retardation in favor of diagnosing him with more politically palatable ailments, like conduct

disorders and behavioral problems, the Court refuses to treat his lack of prior diagnosis as preclusive.

Etiological factors appear to bolster the conclusion that Brumfield was and is mentally retarded. Etiology divides up into four general categories: biomedical, social, behavioral, and educational. (10th Edition, Ex. P-11, p. 123). The State failed to present etiological testimony as such, though its experts certainly did evaluate Brumfield's social, behavioral and educational issues as represented in his medical and school records. Biomedical factors relate to genetics and parental health during pregnancy (prenatal), premature birth and birth injury (perinatal), and nutrition, existence of traumatic brain injury, and degenerative disorders (postnatal). (*Id.*, Table 8.1, p. 127).

Dr. Weinstein testified regarding Brumfield's etiological risk factors. (*See* Weinstein Report, Doc. 30-1, p. 17). With regard to biomedical factors during the prenatal period, he found that Brumfield's mother had psychiatric problems and took psychotropic medication during her pregnancy. (Doc. 102, pp. 88-89). In the perinatal period, Brumfield was born prematurely at 36 weeks and his birth weight appears to have been low at between three and three and a half pounds. (*Id.*, p. 89). Brumfield also suffered fetal stress during birth. (*Id.*). Postnatally, Brumfield was shot and hit by a car prior to age 18 (*id.*, pp. 90-91), although neuroimaging of his brain did not reveal any lasting effect. (*See* Merikangas Report, Doc. 30-1, p. 41). Genetically, it appears several of Brumfield's family members also suffer from mental retardation, including a wheelchair-bound first cousin with moderate to severe retardation. (Weinstein Report, Doc. 30-1, p. 17; Weinstein Testimony, Doc. 102, pp. 33-35).

With regard to the social factors, Brumfield was institutionalized, neglected, and suffered severe physical abuse from domestic violence. (Weinstein Testimony, Doc. 102, p. 92).

Brumfield's mother lacked prenatal care and did not even know she was pregnant until six months into her term. (*Id.* p. 88). Poverty played a large role throughout Brumfield's life. (*Id.*).

With regard to educational factors, Weinstein testified that school officials' efforts to intervene in Brumfield's educational decline were inadequate, resulting in delayed diagnosis of Brumfield's deficiencies. He also found inadequate family support, including his mother's lack of preparation for parenthood. (*Id.*, pp. 90-92).

Behaviorally, Brumfield suffered from apparent parental drug use during pregnancy along with violence, abuse and neglect during his upbringing. (*Id.* pp. 88-89).

All of the shortcomings listed above are risk factors that play an important role in making a mental retardation diagnosis. (10th Edition, Ex. P-11, pp. 123-128). The Court's conclusions with respect to the first two prongs have been shown by a preponderance of the evidence to have existed before Brumfield turned 18. While he was not diagnosed as mentally retarded prior to adulthood, that fact alone in no way detracts from this Court's conclusion. The etiological risk factors, along with Brumfield's school and medical records, indicate that his mental health problems and developmental delays occurred prior to adulthood. The State has introduced no evidence suggesting that Brumfield's mental health problems were caused by brain trauma or through another causative factor manifesting itself after he became an adult. Nor could the State's experts even pretend to know many of his etiological risks because they failed to interview anyone other than Brumfield himself. While disagreement certainly exists over whether Brumfield's school records and prior medical history preclude a diagnosis of mental retardation, show another related diagnosis, or simply fail to meet the *Atkins* standard, those disagreements center on differing interpretations of evidence, not on an absence of evidence prior to adulthood. Based on the showing of substantial intellectual functioning and adaptive

behavior deficiencies detailed above, the Court credits the testimony of Brumfield's experts and finds Brumfield has met his burden to show by a preponderance of the evidence that those deficits occurred before he turned 18.

## IV.

Judges are tasked with solemn and difficult obligations. At times, they must grapple with the subjective elements of our legal system and search in vain for the easy answer, the convenient out. Only by applying an equal amount of diligence and common sense to the unsavory cases that courts normally apply to the familiar ones can it be said that "equal justice under law," that confident phrase boldly inscribed above the entrance to the Supreme Court, is uniformly available to all.

In evaluating *Akins* claims of mental retardation, courts must disregard whatever pre-conceptions they might have about this intellectual disability. Mildly mentally retarded persons usually do not have obvious physical manifestations of their shortcomings, as may be the case with persons diagnosed with Down's Syndrome. Nor are their intellectual capabilities so severely impaired as to be immediately noticeable to most people in casual conversation, as is the case with profoundly mentally retarded individuals. Indeed, the line between the upper range of mildly mentally retarded persons and the borderline cases where mild mental retardation is not shown can be exceedingly blurry and subjective. Yet if we as a society are to effectuate the evolving standard of decency contemplated by the Eighth Amendment's prohibition on cruel and unusual punishment, we must accept as a given that certain cases will present unfortunate facts which, when viewed under the law, result in an outcome at odds with majoritarian sentiment. This may be one of those cases in the eyes of some.

It bears repeating that the remedy granted here is a limited one. While ineligible for execution, Brumfield will remain incarcerated in Angola for the rest of his life. This ruling does not "let him off easy" on some convoluted procedural technicality. It merely seeks to fairly apply the law as written. Louisiana's statute vests significant discretion in making the mental retardation evaluation with the jury. But no jury is available now. In a post-verdict posture, the Louisiana Supreme Court charges judges with making this decision. Judges must weigh the credibility of witnesses and fair-mindedly view the evidence presented. Even a convicted murderer deserves no less. Had the State presented more persuasive expert testimony, the result here might have been different. But it is not the role of a judge to hypothesize what testimony or evidence might have been presented; we can only act with what we have before us. At bottom, this case is about dispassionately applying the clinical guidelines on mental retardation, which Louisiana law has adopted as its legal test, to the facts as presented. Tasked with this duty, the Court concludes, under the totality of the circumstances and based on a preponderance of the evidence, Kevan Brumfield has demonstrated he is mentally retarded as defined by Louisiana law.

## V.  <u>Conclusion; Order</u>

Kevan Brumfield's petition for a writ of habeas corpus is hereby GRANTED insofar as he is ineligible for execution because he is mentally retarded.

Accordingly, it is ORDERED that the State is permanently enjoined from executing Brumfield.

Signed in Baton Rouge, Louisiana, on February 22, 2012.

_____

**JAMES J. BRADY, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**